UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATHANIEL S. SHAPO, Director of Insurance of )
the State of Illinois, solely in his capacity as statutory )
and court-affirmed Liquidator of Coronet Insurance )
Company, Crown Casualty Company and National )
Assurance Indemnity Company, )
         )
                          Plaintiff, )
         )
     vs. )
         )
CLYDE WM. ENGLE; TIMOTHY LOWELL )
BROWN; LEE N. MORTENSON; HOWARD )
FRIEDMAN; EVERETT A. SISSON; ROBERT )
SPILLER; GLENN J. KENNEDY; RICHARD A. )
LEONARD; PAUL HOWARD ALBRITTON JR.; )
PETER HENRY BERGMAN; DAVID JOHN )        98 C 7909
BLEARS; JOHN CHARLES RUSSELL; MICHAEL )
JOSEPH TUCKER; MARK EDWARD VANDAM; )
TELCO CAPITAL CORPORATION; RDIS )
CORPORATION; WISCONSIN REAL ESTATE )
INVESTMENT TRUST; HICKORY FURNITURE )
CORPORATION; INDIANA FINANCIAL )
INVESTORS, INC.; SUNSTATES CORPORATION; )
NORMANDY INSURANCE AGENCY, INC.; )
SEW SIMPLY SYSTEMS, INC.; SUNSTATES )
EQUITIES, INC.; SUNSTATES FINANCIAL )
SERVICES, INC.; ALBA-WALDENSIAN )
HOLDINGS COMPANY, RMHC (DELAWARE), INC.; )
WELLCO  HOLDINGS COMPANY; SUNSTATES )
REALTY GROUP, INC.; and SCHUYLER ROCHE & )
ZWIRNER, P.C.; )
                    Defendants. )

DOCKETED
JUL 13 1999

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the court on several Defendants' motions to dismiss. For the reasons set forth below, we grant the Defendants' motions.


## BACKGROUND

We set forth the factual background of this case in our previous decision in this matter, Shapo v. Engle, et al., 98 C 7909 (N.D. Ill. June 10, 1999) (Kocoras, J.) (denying certain Defendants' motion for advancement of expenses and costs), as amended by Shapo v. Engle, et al., 98 C 7909 (N.D. Ill. June 19, 1999) (Kocoras, J.). Because, however, we are presently faced with the first dispositive motion proffered in this matter, we recite below the full factual background underlying this action, accepting as true the allegations in the complaint which we are obligated to do.


## A.    Brief Summary of the Case

Pursuant to § 193(3) of the Illinois Insurance Code, 215 ILCS 5/1, et seq., plaintiff Nathaniel S. Shapo ("the Liquidator"), the Director of Insurance of the State

of Illinois, in his capacity as the Liquidator of the Coronet Insurance Company ("Coronet"), Crown Casualty Company ("Crown Casualty") and National Assurance Indemnity Company ("National Assurance") (collectively "the Insurance Companies"), brings this action against several individuals and companies alleging, inter alia, the existence of a civil conspiracy in which the Insurance Companies' resources were "siphoned" off and used to fund the activities of other businesses and certain individuals. The alleged "mastermind" of the civil conspiracy was Defendant Clyde Wm. Engle ("Engle"), the former Chairman of the Board of the Insurance Companies and the former Vice President of Coronet. Engle allegedly carried out the charged conspiracy with a group of individuals who formerly served as directors of the Insurance Companies and other affiliated businesses.[1]

---

[1]    Glenn J. Kennedy, the Chief Financial Officer of Defendant Sunstates Corporation and Richard A. Leonard, an officer and director of Defendant Sunstates Corporation, are named as individual defendants. The following group is referred to as "the Director Defendants," as each served in the capacity listed below for one or more of the Insurance Companies when those companies allegedly engaged in the charged conspiracy: Paul Howard Albritton, Jr., who served as a director of the Insurance Companies from at least 1990 until 1992; Peter Henry Bergman, who served as a director of the Insurance Companies from at least 1990 until 1993 and President of the Insurance Companies from at least 1990 until 1992; David John Blears, who served as a director of the Insurance Companies from at least 1990 until 1991 and Vice President of Coronet from at least 1990 until 1991; Timothy Lowell Brown, who served as a director, Chief Operating Officer and Vice President of the Insurance Companies from 1994 through December 1996; Lee N. Mortenson, who served as a director of the Insurance Companies from 1990 through December 1996,
(continued...)

The Liquidator claims Engle, through his positions with, and his control of, the Insurance Companies, along with "his control group," improperly diverted over $70 million out of the Insurance Companies to or for the benefit of other Engle-controlled businesses.[2] The conspiracy allegedly involved a series of illegal

---

[1](...continued)
Vice President of the Insurance Companies from 1990 until 1993, President of the Insurance Companies from 1993 through December 1996 and as a director of Defendant Sunstates Corporation and certain other defendant corporations; Howard Friedman who served as a director of Coronet from 1991 through December 1996, a director of National Assurance from 1993 through December 1996, a director of Crown Casualty from 1994 through December 1996, a director and officer of certain other defendant corporations and Assistant Secretary of the Insurance Companies; John Charles Russell who served as a director and President of the Insurance Companies from 1992 until 1993; Everett A. Sisson who served as a director of the Insurance Companies from 1993 through 1996; Robert Spiller who served as a director of the Insurance Companies in 1996; Michael Joseph Tucker who served as a director of Crown Casualty from 1992 through 1993 and as Vice President of the Insurance Companies from 1992 through 1994; and Mark Edward Vandam who served as Vice President of the Insurance Companies from 1992 through 1993.

[2] The Liquidator names as defendants the following "Parent Companies," businesses which Engle and "his control group" allegedly either controlled or maintained a financial interest in and which allegedly benefitted from the charged conspiracy: RDIS Corporation ("RDIS"), formerly known as Libco Corporation, a Delaware corporation with its principal place of business in Illinois (Engle is and at all relevant times was the controlling shareholder); Telco Capital Corporation ("Telco"), a Delaware corporation with its principal place of business in Illinois (Engle is and at all relevant times was the controlling shareholder); Wisconsin Real Estate Investment Trust ("Wisconsin Real Estate"), a Wisconsin trust with its principal place of business in Illinois (at all relevant times, Engle was the controlling shareholder); Hickory Furniture Company ("Hickory Furniture"), a Delaware corporation with it principal place of business in North Carolina (Engle is and at all relevant times was the controlling shareholder); Sunstates Corporation, formerly
(continued...)

- 4 -

transactions by which Engle and others removed cash and other assets from the Insurance Companies and improperly transferred the money between the Engle-controlled Parent Companies (see note 2 supra) and the Engle-controlled Downstream Affiliates (see note 3 infra). The Liquidator alleges that, rather than using the money to pay claims of the Insurance Companies' policyholders, Engle utilized the money to support his own personal and business interests.

## C.    Factual Background

Coronet, Crown Casualty and National Assurance are all Illinois-domiciled insurance companies. At all times relevant to this lawsuit, Coronet was, either directly or indirectly, the 100% owner of Crown Casualty and National Assurance. In approximately 1985, Engle was the Chairman of the Board, Chief Executive Officer and controlling shareholder of Acton/Sunstates, now known as Sunstates Corporation, a Delaware corporation with its principal place of business in North

---

[2](...continued)
known as Acton/Sunstates, ("Acton/Sunstates"), a Delaware corporation with its principal place of business in North Carolina (Engle is and at all relevant times was the controlling shareholder). The Liquidator also names as defendants Indiana Financial Investors, Inc. ("Indiana Financial"), an Indiana corporation, and Normandy Insurance Agency, Inc. ("Normandy Insurance"), an Illinois corporation, which the Liquidator claims received either cash or other assets illegally diverted from the Insurance Companies.

Carolina. On April 1, 1985, Acton/Sunstates purchased all of the outstanding shares

of Normandy Insurance Agency, Inc. ("Normandy Insurance"), an Illinois insurance

corporation and the then-sole shareholder of Coronet. As a result of this purchase,

Normandy Insurance became a wholly-owned subsidiary of Acton/Sunstates. The

Liquidator further alleges that, from April 1, 1985 until late 1996 or early 1997,

when the Insurance Companies were declared insolvent (see infra), Engle

"dominated and controlled the affairs" of Normandy Insurance, Coronet, Crown

Casualty and National Assurance. After Acton/Sunstates purchased Normandy

Insurance, thereby gaining control over the Insurance Companies, Engle purportedly

caused Coronet to "form, purchase or otherwise obtain an ownership interest" in a

group of companies the Liquidator refers to as "the Downstream Affiliates."[3]

---

[3]    The "Downstream Affiliates" include: Defendant Sew Simple Systems,
Inc. ("Sew Simple"), a South Carolina corporation; Defendant Sunstates Equities,
Inc. ("Sunstates Equities"), formerly known as Coronet Equities, Inc., a Florida
corporation with its principal place of business in North Carolina; Defendant
Sunstates Financial Services, Inc. ("Sunstates Financial"), a Florida corporation with
its principal place of business in North Carolina; Pensacola Holding Corporation
("Pensacola Holding"), a Florida corporation; Coronet Financial Group, Inc.
("Coronet Financial"), a Florida corporation; Defendant Alba-Waldensian Holdings
Company ("Alba Holdings"), an Illinois corporation; Defendant RMHC (Delaware),
Inc. ("RMHC"), a Delaware corporation, formerly known as Rocky Mountain
Holdings Company, an Illinois corporation; Defendant Wellco Holdings Company
("Wellco Holdings"), an Illinois corporation; and Defendant Sunstates Realty Group,
Inc. ("Sunstates Realty"), a Florida corporation.

Certain of the "Downstream Affiliates are named defendants in this action. See note 3 supra.[4]

The Liquidator alleges Engle and his control group dominated the Boards of Directors of the Insurance Companies and that Engle controlled the Parent Companies that either directly or indirectly owned the Insurance Companies. Through this domination, Engle and his control group allegedly prevented the Insurance Companies from enforcing their rights against the Defendants to this action. The Liquidator also claims, as set forth more fully below, that "Engle and his control group operated the Insurance Companies in their own personal interests and contrary to the best interests of the Insurance Companies" by diverting money from the Insurance Companies to the Parent Companies and the Downstream Affiliates.

We briefly summarize below the transactions and other conduct the Liquidator claims demonstrates the existence of an illegal conspiracy to divert money from the Insurance Companies to Engle-controlled entities.

---

[4]       Also named as a Defendant is Schuyler Roche & Zwirner, P.C. ("Schuyler Roche"), a law firm with its principal place of business in Illinois. From approximately July 1996 up to and including the date of the filing of the second amended complaint (February 23, 1999), Defendant Howard Friedman (see note 1 supra) has been a principal with Schuyler Roche. Also, Schulyer Roche has served as counsel to the Insurance Companies at times relevant to this matter.

- In 1991 and 1992, Engle, Glenn J. Kennedy, Richard A. Leonard and the then-serving Director Defendants allegedly caused $7,600,000 to be transferred from Coronet to Acton/Sunstates through two Downstream Affiliates, Sunstates Equities and Sunstates Financial. The payments were ostensibly made to satisfy debts Sunstates Equities and Sunstates Financial owed Acton/Sunstates. The Liquidator claims the debts never existed.

- Between 1991 and 1995, the Insurance Companies transferred approximately $50,000,000 to three Downstream Affiliates, Sunstates Equities, Sunstates Financial and Coronet Financial, who thereafter transferred approximately $21,000,000 to the Parent Companies, allegedly in satisfaction of payables owed by them to the Parent Companies. The Liquidator claims that the Insurance Companies were the only source of cash for the Downstream Affiliates involved and further claims that the Downstream Affiliates could not have made the transfers to the Parent Companies without cash from the Insurance Companies.

- Between 1990 and 1995, Engle, Kennedy, Leonard and the then-serving Director Defendants caused two Downstream Affiliates, Sunstates Equities and Pensacola Holding, to pay over $6,000,000 in "management fees" to various Parent Companies, including Acton/Sunstates, Telco and Hickory Furniture. The Liquidator claims that any money paid by Sunstates Equities and Pensacola Holding was, in reality, the Insurance Companies' money because neither Sunstates Equities nor Pensacola Holding had any source of cash other than the Insurance Companies. The Liquidator further claims that the purported "management fees" paid

to the Parent Companies were unnecessary because Coronet employees had the necessary skill and experience to provide whatever management services the Parent Companies provided Sunstates Equities and Pensacola Holding.

- Between 1990 and 1995, Engle caused the Insurance Companies and Sunstates Equities to purchase over $24,000,000 of securities in certain Parent Companies, including Acton/Sunstates, Hickory Furniture, Indiana Financial and Wisconsin Real Estate. Although the Insurance Companies "directly" purchased only $3,400,000 of these securities, the remaining $20,600,000 of securities purchased by Sunstates Equities was made using money the Insurance Companies transferred to Sunstates Equities. The Liquidator alleges that, prior to the securities purchases, the Parent Companies were performing poorly and that the cash infusions allowed Engle and others to "consolidate and maintain their control" over the Parent Companies.

For each of the above-listed transactions, the Liquidator claims that the transfers of money from one or more of the Insurance Companies ultimately to the Engle-controlled Parent Companies were in essence dividends and should have been reported as such. The Liquidator further alleges that each of the above-listed transfers was made at a time when, because of their reduced surplus and poor operating results, the Insurance Companies could not have legally paid dividends without the approval of the Illinois Department of Insurance. Finally, the Liquidator claims that for each of the above-listed transactions, one or more of the Insurance

Companies' audited financial reports falsely reported that no dividends were paid for the years of the respective transfers and falsely treated the transfers of money from the Insurance Companies to certain Downstream Affiliates as investments in affiliates, rather than as dividends or distributions.

The alleged conspiracy also involved the following activities:

- In 1994, certain of Coronet's wholly-owned subsidiaries were caused to borrow $10,000,000 from LaSalle National Bank. This loan was allegedly secured by stock in three publicly-traded companies. The Liquidator claims that in December 1995, Engle caused the loan to be renewed in the amount of $12,500,000, still secured by the publicly-traded companies' stock, and thereafter, in February 1996, Kennedy directed $3,000,000 of the renewed loan proceeds to be distributed to Sunstates Financial. The Liquidator also alleges that Kennedy further ordered the $3,000,000 to be paid by Sunstates Financial back to Coronet as a reduction in principal in Sunstates Financial bonds held by Coronet. The Liquidator claims that the net result of these transactions was that Coronet subsidiaries pledged their assets as security on loan proceeds that were ultimately used to repay Sunstates Financial's preexisting financial obligations to Coronet.

- Between February 1993 and December 1994, Engle caused Coronet and two Downstream Affiliates, Sunstates Equities and Coronet Financial, to purchase at least $2,200,000 worth of artwork, jewelry and other collectibles, including rare books and oriental rugs. These items were allegedly billed to Coronet, but maintained and utilized by

Engle and his wife at their personal residence. The Liquidator claims that Sunstates Equities and Coronet Financial had few sources of cash other than the Insurance Companies and that Engle used the Insurance Companies' money to purchase the luxury items noted above.

- In November 1996, Engle, Kennedy and the then-Boards of Directors of the Insurance Companies conspired to strip Coronet of its assets in anticipation of the Illinois Department of Insurance placing the Insurance Companies in conservation. These actions, which allegedly took place between November 4 and 29, 1996, came in response to letters and Corrective Orders from the Illinois Department of Insurance in which the department expressed concern over the Insurance Companies' relationships with other Engle-controlled companies. Included in these correspondence was a January 23, 1996 letter ("the January 23 Letter"), in which Illinois Department of Insurance regulators ordered the Insurance Companies to notify them, on a monthly basis, of all sales and purchases of investments by the Insurance Companies. The Liquidator further claims that Kennedy sought to "disguise the illegality" of several transactions between the Insurance Companies and other Engle-controlled entities by back-dating the effective date of those transactions. Finally, the Liquidator alleges that Engle, Kennedy and the then-Boards of Directors of the Insurance Companies devised a "Disaster Plan" that they would carry out should it become clear that the Illinois Department of Insurance was going to place the Insurance Companies in conservation.

- The Liquidator alleges that, consistent with the "Disaster Plan" noted above, Engle and the then-

Boards of Directors of the Insurance Companies caused Coronet to surrender $6,427,296.25 in bonds and preferred stock of Sunstates Equities, Sunstates Financial, Alba Holdings and RMHC. The Liquidator claims Coronet received nothing in return and recorded the transactions as "contributions to paid-in capital" of those companies. Finally, the Liquidator asserts that the so-called contributions were not reported to insurance regulators as required by applicable administrative orders.

- The Liquidator alleges that, prior to November 6, 1996, the Insurance Companies owned 100% of certain Downstream Affiliates, namely, Sunstates Equities, Sunstates Financial, RMHC, Wellco Holdings and Alba Holdings. The Liquidator further alleges that on November 6, 1996, approximately three weeks after the Illinois Department of Insurance issued Corrective Order No. 96-02, which prohibited disbursements or transactions between any of the Insurance Companies and any other Engle-controlled company, Engle and his control group caused Sunstates Equities, Sunstates Financial, RMHC, Wellco Holdings and Alba Holdings to issue additional common stock to other Engle-controlled companies so as to reduce the Insurance Companies' interests in the involved Downstream Affiliates.[5]

---

[5] The Liquidator alleges that the Insurance Companies' interests in certain of the Downstream Affiliates have been reduced, as follows: Acton/Sunstates purports to own 58.5% of Sunstates Equities and contends that the ownership interests of Coronet, National Assurance and Crown Casualty in Sunstates Equities

(continued...)

- The Liquidator alleges that prior to June 30, 1996, the Insurance Companies owned bonds issued by Sunstates Equities and Sunstates Financial and that in July 1996, certain "Defendants," including Leonard and Mortenson, caused $1,156,003 of those bonds to "be surrendered without any consideration as 'capital contribution' to the issuers." The Liquidator further alleges that, also in July 1996, certain "[D]efendants" caused an additional $991,293 of the same bonds to be redeemed in exchange for other bonds issued by Sunstates Equities and Sunstates Financial, which in turn were replaced by shares of those companies' common stock. Finally, the Liquidator claims that the Insurance Companies did not report the so-called "capital contributions" as required by the January 23 Letter.

- The Liquidator alleges that prior to June 30, 1996, Crown Casualty and National Assurance owned preferred stock in Sunstates Equities and Sunstates

---

[5](...continued)
have been reduced to 6.4%, 28.7% and 6.4% respectively; Sew Simple purports to own 59% of Sunstates Financial and contends that the ownership interests of Coronet, National Assurance and Crown Casualty in Sunstates Financial have been reduced to 22.6%, 14.7% and 3.7% respectively; Wellco Holdings purports to own 51.4% and Sew Simple purports to own 38.7% of RMHC and both contend that the ownership interests of Coronet, National Assurance and Crown Casualty in RMHC have been reduced to 7.8%, 1.2% and 0.9% respectively; Sew Simple purports to own 90% of Wellco Holdings and contends that Coronet's ownership interest has been reduced to 10%; and Sew Simple purports to own 8.8%, Sunstates Equities purports to own 1% and Rocky Mountain purports to own 70.2% of Alba Holdings and the three companies contend that Coronet's ownership interest has been reduced to 20%.

Financial and that on or about July 31, 1996, Engle caused Crown Casualty and National Assurance to "surrender" approximately $343,998 worth of such preferred stock, without receiving any consideration in return. The Liquidator further alleges that the "surrenders" were not reported to the Illinois Department of Insurance as required by the January 23 Letter.

- The Liquidator claims that, at all times relevant to this lawsuit, the Insurance Companies owned The Springs, Inc., an entity which owned The Springs Resort, a golf course and hotel resort in Wisconsin, and at least 73 undeveloped residential lots adjacent to the Springs Resort, with a market value of approximately $4.8 million. The Liquidator further alleges that on November 14, 1996, "Engle and his control group" caused The Springs, Inc. to transfer 65 of the undeveloped lots to Sunstates Realty and Sew Simple, purportedly as cancellation of an intercompany debt in the amount of $2,533,847. Finally, the Liquidator claims that, as a result of this transfer, the Insurance Companies lost valuable real estate without obtaining reasonably equivalent value in exchange (or may not have received any value at all).

## C.    The Liquidation of the Insurance Companies

In late 1996 and early 1997, each of the Insurance Companies was declared insolvent and ordered into liquidation by the Circuit Court of Cook County, Illinois, as follows: Coronet on December 24, 1996; Crown Casualty on January 31, 1997; and National Assurance on January 3, 1997 (collectively "the Liquidation Orders").

The Coronet liquidation is currently proceeding in the Circuit Court of Cook County, Illinois, Chancery Division, under the caption <u>In the Matter of the Liquidation of Coronet Insurance Company</u>, 96 CH 13422.

The Coronet Liquidation Order appoints the Director of Insurance of the State of Illinois as Liquidator of Coronet, vests in him "title to all property, assets, contracts and rights of action of" Coronet, and authorizes him "to deal with the property, assets, business and affairs of Coronet, and to sue and defend for Coronet, or for the benefit of Coronet's policyholders and creditors, in the courts in his name as the Liquidator or in the name of Coronet." The Liquidator claims that policyholders and creditors of the Insurance Companies have filed "thousands of claims" against the Insurance Companies' estates and that he is "marshaling [] assets and determining the merits of the claims pursuant to the procedures set forth in the [Illinois] Insurance Code and the Liquidation Order[s]."

**D.    The Liquidator's Second Amended Complaint**

On December 14, 1998, Arnold Dutcher ("Dutcher"), Shapo's predecessor as Director of Insurance of the Illinois Department of Insurance, filed an eight-count complaint against certain individuals and companies arising out of the events described above. On February 23, 1999, after Dutcher amended the complaint a

first time, Shapo, solely in his capacity as statutory and court-affirmed Liquidator

of Coronet, Crown Casualty and National Assurance, filed a twelve-count second

amended complaint against Engle, Kennedy, Leonard, the Director Defendants (see

note 1 supra), the Parent Companies (see note 2 supra), the Downstream Affiliates

(see note 3 supra) and Schuyler Roche (see note 4 supra). In total, the Liquidator

seeks from the Defendants over $70,000,000 in actual damages, together with treble

damages under RICO, attorneys' fees and punitive damages. Of particular

significance to the motions presently before the court, the Liquidator's second

amended complaint states:

> [The Liquidator] appears solely in his statutory and court-affirmed capacity as Liquidator of the Insurance Companies. In this complaint, Plaintiff is referred to as 'the Liquidator.' The Liquidator brings this suit under the authority of § 193(3) of the Illinois Insurance Code [215 ILCS 5/193(3)], on behalf of and for the benefit of the policyholders and creditors of the Insurance Companies.

Second Amended Complaint ¶ 6 (emphasis added).

Counts I and II of the Liquidator's second amended complaint allege violations

of 18 U.S.C. § 1962, et seq. ("RICO"). In count I, Violation of 18 U.S.C.

§ 1962(c) against Engle, Kennedy, Leonard, Mortenson, Friedman and the Parent

Companies (other than Acton/Sunstates), the Liquidator alleges that Engle,

Kennedy, Leonard, Mortenson and Friedman, through their associations with Acton/Sunstates and/or other Parent Companies, engaged in a pattern of racketeering activity, in violation of federal law, including, but not limited to, "a scheme to defraud Coronet by looting cash and other assets of the Insurance Companies that should have been used to pay policyholder claims" and "a scheme to deceive insurance regulators and others by concealing and misrepresenting material facts from them about" the looting of cash and other assets of the Insurance Companies. The named Defendants allegedly made the misrepresentations in Annual Statements filed with the Illinois Department of Insurance, as well as invoices, Holding Company Registration Statements and memos, certain of which were allegedly sent using the mails, private or commercial carriers and wires.

In count II, Violation of 18 U.S.C. § 1962(d) against Engle, Kennedy, Leonard, Friedman, the Parent Companies (other than Acton/Sunstates) and the Director Defendants, the Liquidator alleges that Engle, Kennedy, Leonard, Friedman, the Parent Companies (other than Acton/Sunstates) and the Director Defendants conspired to participate in the above-described illegal conduct through a pattern of racketeering activity. With respect to the Director Defendants, the Liquidator alleges each "facilitated the illegal schemes by, at least, knowingly

approving or ratifying one or more of the illegal transactions that occurred during the period of his directorship."

The remaining counts, III-XII, allege violations of state law, specifically, breach of fiduciary duty (count III), professional malpractice (count IV), breach of attorney's duty of loyalty (count V), aiding and abetting Engle's breach of fiduciary duty (count VI), conversion (count VII), civil conspiracy (count VIII), violation of the Illinois Insurance Holding Company Systems Act, 215 ILCS 5/131.1, et seq. (West 1994) and violation of the corrective orders issued by the Illinois Department of Insurance (count IX), and violation of the Uniform Fraudulent Transfer Act, 740 ILCS 160/1, et seq. (West 1994) (count XII). In count X, the Liquidator seeks a declaratory judgment establishing the Insurance Companies' respective interests in certain Downstream Affiliates, as set forth more fully above. See note 5 supra. Finally, in count XI, the Liquidator seeks an order requiring certain Defendants to provide him with a full and complete accounting of their respective financial condition and operations, including, but not limited to, all transactions that purport to have diminished the Insurance Companies' respective ownership interests in the Downstream Affiliates identified in count X.

## E.    The Present Motions To Dismiss

Through the present motions, several of the Defendants seek dismissal of the Liquidator's second amended complaint.  Mortenson, Sisson, Albritton, Kennedy, Leonard, Telco, RDIS, Hickory Furniture, Indiana Financial, Normandy Insurance, Acton/Sunstates, Sew Simple, Sunstates Equities, Sunstates Financial, Alba Holdings, RMHC, Wellco Holdings and Sunstates Realty (collectively "the Group Defendants") filed a joint memorandum in support of their motion to dismiss certain counts of the second amended complaint.  Wisconsin Real Estate and Schuyler Roche each filed an individual motion to dismiss the Liquidator's claims against them.  Blears filed a motion to dismiss, to which Spiller, Brown, Russell and Tucker joined.[6]  We address the parties' arguments below.  Before we address the motions to dismiss, we set forth the legal standard that guides our analysis.

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case.  A defendant must

---

[6]        Pursuant to an agreed motion between the Liquidator and Blears, we stayed this matter as to Blears, pending settlement discussions between the parties. We note, however, that neither Blears, nor any of the Defendants who joined Blears' motion to dismiss, filed a reply in support of their motion.

meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted. In ruling on a motion to dismiss, the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. Bontkowski v. First National Bank of Cicero, 998 F.2d 459, 461 (7th Cir. 1993), cert. denied, 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993). The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992), cert. denied, 506 U.S. 893, 113 S.Ct. 267, 121 L.Ed.2d 196 (1992). It is with these principles in mind that we review the Defendants' motions to dismiss.

## DISCUSSION

### A.    The Liquidator's RICO Counts

In count I, the Liquidator purports to bring a RICO claim, pursuant to 18 U.S.C. § 1962(c), against Engle, Kennedy, Leonard, Mortenson, Friedman and the

Parent Companies (other than Acton/Sunstates), alleging that the individual Defendants, through their associations with Acton/Sunstates and/or other Parent Companies, engaged in a pattern of racketeering activity to defraud Coronet of its cash and other assets. The Liquidator also alleges the Defendants engaged in a scheme to deceive insurance regulators and others by concealing and misrepresenting material facts from them about the looting of cash and other assets of the Insurance Companies. In count II, the Liquidator alleges that Engle, Kennedy, Leonard, Friedman, the Parent Companies (other than Acton/Sunstates) and the Director Defendants, conspired to participate in the above-described illegal conduct through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

Certain moving Defendants argue that the Liquidator lacks standing to pursue the present RICO actions. On the face of his complaint, the Liquidator states that he "brings this suit under the authority of § 193(3) of the Illinois Insurance Code [215 ILCS 5/193(3)], on behalf of and for the benefit of the policyholders and creditors of the Insurance Companies." Second Amended Complaint ¶ 6. The Defendants assert that although the Liquidator's authority to bring this action is codified at 215 ILCS 5/193(3), which permits him to prosecute actions "on behalf of the creditors, members, policyholders, or shareholders of the [liquidated

insurance] company," see 215 ILCS 5/193(3), RICO authorizes litigation only by

"a person injured in his business or property by reason of a violation of section 1962

of this chapter . . ." See 18 U.S.C. § 1964(c). The Defendants claim that courts

narrowly construe RICO to permit suits only by, or on behalf of, those who suffer

direct injuries resulting from the charged activity, and, because the policyholders

and creditors of the Insurance Companies suffered, if at all, indirect or remote

injuries, the Liquidator may not pursue a RICO action on their behalf.

Rather than challenge whether he may pursue this action on behalf of the

Insurance Companies' policyholders and creditors, the Liquidator points to language

in the second amended complaint which he claims demonstrates that the RICO

actions are brought on behalf of the Insurance Companies, entities that did suffer

direct injuries. Specifically, in the "Summary of Claims" section of his second

amended complaint, the Liquidator notes that "[t]his action is brought to recover

property and damages due [the Insurance Companies] and to compensate them for

losses caused by the misconduct of their directors, attorneys and others." Second

Amended Complaint ¶ 1. In addition, the Liquidator argues we should interpret the

language of § 193(3) of the Illinois Insurance Code more broadly than the

Defendants would like, to permit him to bring an action on behalf of the Insurance

Companies, particularly where the statute states that the Liquidator's rights

"includ[e], but [are] not limited to, prosecuting any action, claim, suit, or proceeding on behalf of the creditors, members, policyholders, or shareholders of the [insurance] company." 215 ILCS 5/193 (West 1994) (emphasis added). Finally, the Liquidator claims that other relevant portions of the Illinois Insurance Code clearly permit him to bring this action on behalf of the Insurance Companies, particularly 215 ILCS 5/191, which states "[t]he Director [of Insurance of the State of Illinois] and his successors and successors in office shall be vested by operation of law with the title to all property, contracts, and rights of action of the [insurance] company as of the date of the order directing rehabilitation or liquidation." 215 ILCS 5/191 (West 1994) (emphasis added).

We turn first to the question of the scope of the Liquidator's second amended complaint. Notwithstanding his arguments to the contrary, we think the Liquidator brings the present action solely on behalf of the Insurance Companies' policyholders and creditors. In clear and unambiguous terms, the Liquidator purports to bring this action "on behalf of and for the benefit of the policyholders and creditors of the Insurance Companies." Second Amended Complaint ¶ 6. Those words, carefully and skillfully chosen, trump any argument raised by the Liquidator in his brief in opposition to the Defendants' motions to dismiss. See Kaiser v. Stewart, 965 F.Supp. 684, 687 n.4 (E.D. Penn. 1997) (in rejecting plaintiff's assertion that she

- 23 -

filed her complaint on behalf of the liquidated insurance companies, court held "[i]n a motion to dismiss, it is the complaint which controls."); see also Vargas v. O'Grady, 1993 WL 92445 at *4 (N.D. Ill. 1993) (Lindberg, J.) (where § 1983 plaintiff's complaint named defendants in their official capacities, court rejected plaintiff's assertion that he sued the defendants in their individual capacities, an argument made for the first time in response to the defendants' motion to dismiss, because such argument "cannot contradict the well-pleaded allegations of fact set forth in plaintiff's complaint.").  To reinforce the second amended complaint's averment that he sued only on behalf of the Insurance Companies' policyholders and creditors, the Liquidator cited the Illinois statutory provision that authorizes him to act for and on behalf of "the creditors, members, policyholders, or shareholders" of the Insurance Companies. See Second Amended Complaint ¶ 6 (citing 215 ILCS 5/193 (West 1994)).  In contrast, the Liquidator neither named the Insurance Companies as entities for whose benefit he was suing, nor referenced the separate Illinois statute that vests him with "the title to all property, contracts, and rights of action of the company as of the date of the order directing rehabilitation or liquidation." See 215 ILCS 5/191 (West 1994).  On the face of his second amended complaint, the Liquidator brings this action solely on behalf of the Insurance Companies' policyholders and creditors.

We are unmoved by the Liquidator's argument that we should broadly construe his second amended complaint as asserting RICO claims on behalf of the Insurance Companies. Regardless of the language included in ¶ 1 of the "Summary of Claims," nowhere else in his second amended complaint, other than in the opening paragraph, does the Liquidator contend that he brings the RICO claims on behalf of the Insurance Companies. Furthermore, the language contained in ¶ 1 does not unequivocally demonstrate that the Liquidator brings the RICO claims, or any other claims, on behalf of the Insurance Companies. Finally, and of paramount significance to our determination of this issue, the Liquidator presents us no reason to disregard his own plain and unambiguous language which clearly indicates that he brings the second amended complaint solely on behalf of the Insurance Companies' policyholders and creditors.

Having reached a decision with respect to the scope of the Liquidator's claims, we turn our attention to whether the Liquidator may maintain the RICO actions solely on behalf of the policyholders and creditors of the Insurance Companies. We think the case law makes clear he may not. The Liquidator brings two RICO claims, count I, brought pursuant to § 1962(c), for violations of the RICO statute, and count II, brought pursuant to § 1962(d), for conspiracy to violate the RICO statute. 18 U.S.C. § 1964(c) states, in relevant part:

> [a]ny person injured in his business or property by reason
> of a violation of section 1962 of this chapter may sue
> therefor in any appropriate United States district court and
> shall recover threefold the damages he sustains and the
> cost of the suit, including a reasonable attorney's fee . . .

18 U.S.C. § 1964(c). In <u>Kaiser v. Stewart</u>, 965 F.Supp. 684 (E.D. Penn. 1997),

<u>motion for reconsideration granted in part and denied in part</u>, 1997 WL 476455

(E.D. Penn. 1997), the court was faced with facts very similar to the present matter.

In <u>Kaiser</u>, the Pennsylvania Insurance Commissioner, in her role as liquidator of two

liquidated insurance companies, brought five RICO actions, as well as several state

count claims, "on behalf of creditors, members, policyholders or shareholders" of

the two insurance companies. <u>Kaiser</u>, 965 F.Supp. at 687. The plaintiff named as

defendants nine individuals, one law firm, two trusts, nine corporations, a business

partnership and certain unnamed defendants. <u>Id.</u> at 685. The complaint alleged that

the defendants, "through various acts of malfeasance, misfeasance and nonfeasance,

systematically siphoned assets from and mismanaged the affairs of [the liquidated

insurance companies]. . ." <u>Id.</u>

The defendants moved to dismiss the plaintiff's RICO claims, arguing that the

persons for whom the plaintiff sued did not have standing to pursue RICO claims

because their injuries, if any existed, were not proximately caused by the alleged

misconduct. <u>Id.</u> at 687. Relying upon the Supreme Court's analysis of § 1964(c)

in <u>Holmes v. Securities Investor Protection Corp.</u>, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the <u>Kaiser</u> court held that the plaintiff did not have standing to bring RICO actions on behalf of the policyholders and creditors of the liquidated insurance companies. <u>Kaiser</u>, 965 F.Supp. 687-91.

In <u>Holmes</u>, the plaintiff sought to recover funds it had paid to broker-dealer customers to cover the losses the broker-dealers suffered when, because of financial difficulties, they could not meet their customers' claims. <u>Holmes</u>, 503 U.S. at 261-62. The plaintiff sued 75 individuals who allegedly conspired in a fraudulent scheme that caused the financial difficulties of the broker-dealers. <u>Id.</u> at 262-63. The plaintiff's complaint alleged that the defendants' acts constituted a "pattern of racketeering activity" under RICO and that plaintiff would be entitled to treble damages. <u>Id.</u> The plaintiff also asserted that it sued on behalf of customers of the broker-dealers who did not buy or sell the stock allegedly manipulated by the defendants. <u>Id.</u> The district court granted summary judgment in favor of the defendants due to lack of standing. After the Ninth Circuit Court of Appeals reversed the district court, <u>see</u> 908 F.2d 1461 (9th Cir. 1990), the Supreme Court in turn reversed the Court of Appeals.

For its standing analysis, the <u>Holmes</u> court defined the words "by reason of," the proximate cause language of § 1964, as requiring "some direct relation between

the injury asserted and the injurious conduct alleged." Holmes, 503 U.S. at 268.

The Court observed that "a plaintiff who complained of harm flowing merely from

the misfortunes visited upon a third person by the defendant's acts was generally

said to stand at too remote a distance to recover." Id. at 268-69 (citations omitted).

In concluding that the plaintiff did not have standing to bring a RICO action because

the defendants did not proximately cause injury to non-purchasing customers, the

Holmes Court explained:

> the link is too remote between the stock manipulation
> alleged and the customers' harm, being purely contingent
> on the harm suffered by the broker-dealers.  That is, the
> conspirators have allegedly injured these customers only
> insofar as the stock manipulation first injured the broker-
> dealers and left them without the wherewithal to pay
> customers' claims.  Although the customers' claims are
> senior . . . to those of the broker-dealers' general
> creditors, . . ., the causes of their respective injuries are
> the same: The broker-dealers simply cannot pay their
> bills, and only that intervening insolvency connects the
> conspirators' acts to the losses suffered by the non-
> purchasing customers and general creditors.

Holmes, 503 U.S. at 271.  The Court held that the broker-dealers, not their non-

purchasing customers, were the parties directly harmed by the defendants' conduct

and were, therefore, the ones injured in their "business or property by reason of a

violation of section 1962" of RICO.  Id. at 273; see 18 U.S.C. § 1964(c).

Relying upon <u>Holmes</u>, as well as several other cases, including the Seventh Circuit's decision in <u>Mid-State Fertilizer Co. v. Exchange Nat'l Bank</u>, 877 F.2d 1333, 1336-1337 (7th Cir. 1989), the <u>Kaiser</u> court granted the defendants' motion to dismiss the RICO claims, finding that the plaintiff had no standing to sue on behalf of the insurance companies' policyholders and creditors. <u>Kaiser</u>, 965 F.Supp. at 687-691. Specifically, the court held that only the insurance companies "have suffered directly. [I]n contrast, the losses of their policyholders and other creditors are indirect. [T]he latter simply have not been injured in their 'business or property by reason of a violation of section 1962.'" <u>Kaiser</u>, 965 F.Supp. at 690 (quoting 18 U.S.C. § 1964(c)). The <u>Kaiser</u> court also held that the defendants allegedly injured the policyholders and creditors "only insofar as the siphoning off of assets injured [the insurance companies] and left [the insurance companies] without the means to pay the policyholders' and other creditors' claims." <u>Id.</u>

We find the <u>Kaiser</u> decision instructive here. When we read the Liquidator's second amended complaint as bringing suit only on behalf of the Insurance Companies' policyholders and creditors, a reading consistent with our holding above, <u>Kaiser</u> is directly on point and we must dismiss the Liquidator's RICO claims for lack of standing. Any injuries suffered by the Insurance Companies' policyholders and creditors were indirect because "'only the intervening insolvency

[of the Insurance Companies] connects the conspirators' acts to the losses suffered.'"

Kaiser, 965 F.Supp. at 690 (quoting Holmes, 503 U.S. at 271). Our finding is supported by the Seventh Circuit's interpretation of Holmes. The Seventh Circuit has generally interpreted Holmes to permit only those suffering direct injuries, or individuals representing those who suffered direct injuries, to bring RICO actions. See Gagan v. American Cablevision, Inc., 77 F.3d 951, 959 (7th Cir. 1996) ("[w]here the shareholder's injury resulted directly from an injury to the corporation, but only indirectly from the harm the wrongdoer wreaked upon the corporation, the RICO claim belongs to the corporation, and not the shareholder." (citations omitted); Mendelovitz v. Vosicky, 40 F.3d 182, 187 (7th Cir. 1994) ("under RICO, a corporation does not have standing to sue for damages allegedly accruing from the actions of its directors or officers against third parties, because there can be no proximate cause."); see also Mid-State Fertilizer v. Exchange National Bank of Chicago, 877 F.2d 1333, 1335-36 (affirming summary judgment in favor of defendant on individual plaintiffs' RICO claims because plaintiffs, as sole shareholders of corporate plaintiff, suffered only "derivative injuries" as a result of the alleged misconduct).

Because the Liquidator brings the RICO claims solely on behalf of those suffering indirect injuries, we must dismiss count I of the second amended complaint

for failure to state a claim upon which relief can be granted. Furthermore, because the Liquidator also brings his RICO conspiracy claim, count II, solely on behalf of the Insurance Companies' policyholders and creditors, it too fails and we dismiss count II. Finally, because the RICO claims served as the only basis for federal jurisdiction, we decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over counts III-XII and we dismiss these claims without prejudice to file them in the appropriate state court.

We recognize that our opinion today leaves open certain issues that the parties only briefly touched upon in their submissions to the court. Specifically, a question remains as to whether amending the Liquidator's complaint, to add language affirmatively stating that the RICO claims are brought on behalf of the Insurance Companies, would be futile. Certain courts have held that the "enterprise" through which defendants carry out a RICO violation, see 18 U.S.C. § 1964(c), cannot be the same entity as the victim of the alleged RICO violation. See Kaiser, 965 F.Supp. at 687, n.4 (citing National Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 257-59, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994); Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 267 (3d Cir. 1995)); Kaiser, 1997 WL 476455 at *7-9 (citing Jaguar Cars, 46 F.3d at 267-68); see also LaSalle Bank Lake View v. Seguban, 54 F.3d 387, 393-94 (7th Cir. 1995) (citing Scheidler, 510 U.S. at 257-

59 and Jaguar Cars, 46 F.3d at 267, court questioned plaintiff's RICO theory that bank could simultaneously stand as both the "enterprise" through which defendants conducted their RICO activity and as the victim of such activity); but see LaSalle Bank Lake View v. Seguban, 937 F.Supp. 1309, 1322-24 (N.D. Ill. 1996) (after remand) (rejecting Seventh Circuit's analysis, as well as the Third Circuit's analysis in Jaguar Cars, 46 F.3d at 267, district court held that a single entity may be both the requisite RICO "enterprise" as well as the victim of the alleged RICO activity).

Certain courts have also held that § 1962(c) requires that the "persons" who allegedly engaged in the RICO activity be separate and distinct from the "enterprise" or enterprises through which the RICO activity allegedly occurred. See Kaiser, 1997 WL 476455 at *7-9 (citing Jaguar Cars, 46 F.3d at 265, 268 (discussing Scheidler, 510 U.S. 249; Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993))). We merely highlight these issues, but do not decide them, in the event the Liquidator seeks leave to amend his complaint.


## CONCLUSION

For the reasons set forth above, we grant the Defendants' motions to dismiss counts I and II of the Liquidator's second amended complaint. We also decline to

extend supplemental jurisdiction over the remaining state law claims, counts III-XII, and we dismiss those claims without prejudice.

Charles P. Kocoras
United States District Judge

Dated: _____July 12, 1999_____