Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7909 | **DATE** | 11/10/1999 |
| **CASE TITLE** | NATHANIEL SHAPO vs. CLYDE WM. ENGLE, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  ENTER MEMORANDUM OPINION: Defendants' motions to dismiss are granted in part and denied in part. Defendants are given to and including 12/7/99 in which to answer amended complaint. Status hearing set for 12/28/99 at 9:30a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| ✓ | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | NOV 12 1999 date docketed | | |
| | Docketing to mail notices. | | | | 168 |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| TBK | courtroom deputy's initials | | | date mailed notice | |
| | | | | mailing deputy initials | |

Date/time received in central Clerk's Office

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NATHANIEL S. SHAPO, Director of Insurance of the State of Illinois, solely in his his capacity as statutory and court-affirmed Liquidator of Coronet Insurance Company, Crown Casualty Company and National Assurance Indemnity Company, | ) ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| CLYDE WM. ENGLE; TIMOTHY LOWELL BROWN; LEE N. MORTENSON; HOWARD FRIEDMAN; EVERETT A. SISSON; ROBERT SPILLER; GLENN J. KENNEDY; RICHARD A. LEONARD; PAUL HOWARD ALBRITTON JR.; PETER HENRY BERGMAN; DAVID JOHN BLEARS; JOHN CHARLES RUSSELL; MICHAEL JOSEPH TUCKER; TELCO CAPITAL CORPORATION; RDIS CORPORATION; WISCONSIN REAL ESTATE INVESTMENT TRUST; HICKORY FURNITURE CORPORATION; INDIANA FINANCIAL INVESTORS, INC.; SUNSTATES CORPORATION; NORMANDY INSURANCE AGENCY, INC.; SEW SIMPLE SYSTEMS, INC.; SUNSTATES EQUITIES, INC.; SUNSTATES FINANCIAL SERVICES, INC.; ALBA-WALDENSIAN HOLDINGS COMPANY; RMHC (DELAWARE), INC., WELLCO HOLDINGS COMPANY; SUNSTATES REALTY GROUP, INC.; and SCHUYLER ROCHE & ZWIRNER, P.C., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

98 C 7909

DOCKETED
NOV 12 1999

## __MEMORANDUM OPINION__

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on several Defendant' motions to dismiss. For the reasons set forth below, the Court denies the motions in part and grants the motions in part.

## BACKGROUND

The Court set forth the factual background of this case in previous decisions in this matter. See Shapo v. Engle, No. 98 C 7909, 1999 WL 446853 (N.D. Ill. June 11, 1999) (Kocoras, J.) (denying certain Defendants' motion for advancement of expenses and costs); Shapo v. Engle, No. 98 C 7909, 1999 WL 528528 (N.D. Ill. July 13, 1999) (Kocoras, J.) (dismissing Plaintiff's Second Amended Complaint). Although this motion comes before the Court on motions to dismiss Plaintiff's third amended complaint and various parts thereof, the alleged facts remain the same as in the previous motions before this Court. The Court again recites below the full factual background underlying this action, accepting as true the allegations in the third amended complaint, which the Court is obligated to do.

## A.    Summary of the Case

Pursuant to § 191 of the Illinois Insurance Code, 215 ILL. COMP. STAT. ANN. 5/1, et seq., plaintiff Nathaniel S. Shapo ("the Liquidator"), the Director of Insurance of the State of Illinois, in his capacity as the Liquidator of the Coronet

- 2 -

Insurance Company ("Coronet"), Crown Casualty Company ("Crown Casualty") and National Assurance Indemnity Company ("National Assurance") (collectively "the Insurance Companies"), brings this action against several individuals and companies alleging, inter alia, the existence of a civil conspiracy in which the Insurance Companies' resources were "siphoned" off and used to fund the activities of other businesses and certain individuals. The alleged "mastermind" of the civil conspiracy was Defendant Clyde Wm. Engle ("Engle"), the former Chairman of the Board of the Insurance Companies and the former Vice President of Coronet. Engle allegedly carried out the charged conspiracy with a group of individuals who formerly served as directors of the Insurance Companies and other affiliated businesses.[1]

---

[1] Glenn J. Kennedy, the Chief Financial Officer of Defendant Sunstates Corporation and Richard A. Leonard, an officer and director of Defendant Sunstates Corporation, are named as individual defendants. The following group is referred to as "the Director Defendants," as each served in the capacity listed below for one or more of the Insurance Companies when those companies allegedly engaged in the charged conspiracy: Paul Howard Albritton, Jr., who served as a director of the Insurance Companies from at least 1990 until 1992; Peter Henry Bergman, who served as a director of the Insurance Companies from at least 1990 until 1993 and President of the Insurance Companies from at least 1990 until 1992; David John Blears, who served as a director of the Insurance Companies from at least 1990 until 1991 and Vice President of Coronet from at least 1990 until 1991; Timothy Lowell Brown, who served as a director, Chief Operating Officer and Vice President of the Insurance Companies from 1994 through December 1996; Lee N. Mortenson, who served as a director of the Insurance Companies from 1990 through December 1996, Vice President of the Insurance Companies from 1990 until 1993, President of the Insurance Companies from 1993 through December 1996 and as a director of

(continued...)

- 3 -

The Liquidator claims Engle, through his positions with, and his control of, the Insurance Companies, along with "his Control Group," improperly diverted over $70 million out of the Insurance Companies to or for the benefit of other Engle-controlled businesses.[2]  The conspiracy allegedly involved a series of illegal

---

[1](...continued)
Defendant Sunstates Corporation and certain other defendant corporations; Howard Friedman who served as a director of Coronet from 1991 through December 1996, a director of National Assurance from 1993 through December 1996, a director of Crown Casualty from 1994 through December 1996, a director and officer of certain other defendant corporations and Assistant Secretary of the Insurance Companies; John Charles Russell who served as a director and President of the Insurance Companies from 1992 until 1993; Everett A. Sisson who served as a director of the Insurance Companies from 1993 through 1996; Robert Spiller who served as a director of the Insurance Companies in 1996; and Michael Joseph Tucker who served as a director of Crown Casualty from 1992 through 1993 and as Vice President of the Insurance Companies from 1992 through 1994.

[2]    The Liquidator names as defendants the following "Parent Companies," businesses which Engle and "his control group" allegedly either controlled or maintained a financial interest in and which allegedly benefitted from the charged conspiracy: RDIS Corporation ("RDIS"), formerly known as Libco Corporation, a Delaware corporation with its principal place of business in Illinois (Engle is and at all relevant times was the controlling shareholder); Telco Capital Corporation ("Telco"), a Delaware corporation with its principal place of business in Illinois (Engle is and at all relevant times was the controlling shareholder); Wisconsin Real Estate Investment Trust ("Wisconsin Real Estate"), a Wisconsin trust with its principal place of business in Illinois (at all relevant times, Engle was the controlling shareholder); Hickory Furniture Company ("Hickory Furniture"), a Delaware corporation with it principal place of business in North Carolina (Engle is and at all relevant times was the controlling shareholder); Sunstates Corporation, formerly known as Acton/Sunstates, ("Acton/Sunstates"), a Delaware corporation with its principal place of business in North Carolina (Engle is and at all relevant times was the controlling shareholder).  The Liquidator also names as defendants Indiana Financial Investors, Inc. ("Indiana Financial"), an Indiana corporation, and
(continued...)

transactions by which Engle and others removed cash and other assets from the Insurance Companies and improperly transferred the money between the Engle-controlled Parent Companies (see note 2 supra) and the Engle-controlled Downstream Affiliates (see note 3 infra). The Liquidator alleges that, rather than using the money to pay claims of the Insurance Companies' policyholders, Engle utilized the money to support his own personal and business interests.

## B.    Factual Background

Coronet, Crown Casualty and National Assurance are all Illinois-domiciled insurance companies. At all times relevant to this lawsuit, Coronet was, either directly or indirectly, the 100% owner of Crown Casualty and National Assurance. In approximately 1985, Engle was the Chairman of the Board, Chief Executive Officer and controlling shareholder of Acton/Sunstates, now known as Sunstates Corporation, a Delaware corporation with its principal place of business in North Carolina. On April 1, 1985, Acton/Sunstates purchased all of the outstanding shares of Normandy Insurance Agency, Inc. ("Normandy Insurance"), an Illinois insurance corporation and the then-sole shareholder of Coronet. As a result of this purchase,

---

[2](...continued)
Normandy Insurance Agency, Inc. ("Normandy Insurance"), an Illinois corporation, which the Liquidator claims received either cash or other assets illegally diverted from the Insurance Companies.

Normandy Insurance became a wholly-owned subsidiary of Acton/Sunstates. The Liquidator further alleges that, from April 1, 1985 until late 1996 or early 1997, when the Insurance Companies were declared insolvent (see infra), Engle "dominated and controlled the affairs" of Normandy Insurance, Coronet, Crown Casualty and National Assurance. After Acton/Sunstates purchased Normandy Insurance, thereby gaining control over the Insurance Companies, Engle purportedly caused Coronet to "form, purchase or otherwise obtain an ownership interest" in a group of companies the Liquidator refers to as "the Downstream Affiliates."[3] Certain of the "Downstream Affiliates are named defendants in this action. See note 3 supra.[4]

---

[3] The "Downstream Affiliates" include: Defendant Sew Simple Systems, Inc. ("Sew Simple"), a South Carolina corporation; Defendant Sunstates Equities, Inc. ("Sunstates Equities"), formerly known as Coronet Equities, Inc., a Florida corporation with its principal place of business in North Carolina; Defendant Sunstates Financial Services, Inc. ("Sunstates Financial"), a Florida corporation with its principal place of business in North Carolina; Pensacola Holding Corporation ("Pensacola Holding"), a Florida corporation; Coronet Financial Group, Inc. ("Coronet Financial"), a Florida corporation; Defendant Alba-Waldensian Holdings Company ("Alba Holdings"), an Illinois corporation; Defendant RMHC (Delaware), Inc. ("RMHC"), a Delaware corporation, formerly known as Rocky Mountain Holdings Company, an Illinois corporation; Defendant Wellco Holdings Company ("Wellco Holdings"), an Illinois corporation; and Defendant Sunstates Realty Group, Inc. ("Sunstates Realty"), a Florida corporation.

[4] Also named as a Defendant is Schuyler Roche & Zwirner, P.C. ("Schuyler Roche"), a law firm with its principal place of business in Illinois. From approximately July 1996 up to and including the date of the filing of the second amended complaint (February 23, 1999), Defendant Howard Friedman (see note 1

(continued...)

- 6 -

The Liquidator alleges Engle and his Control Group dominated the Boards of Directors of the Insurance Companies and that Engle controlled the Parent Companies that either directly or indirectly owned the Insurance Companies. Through this domination, Engle and his Control Group allegedly prevented the Insurance Companies from enforcing their rights against the Defendants to this action. The Liquidator also claims, as set forth more fully below, that "Engle and his Control Group operated the Insurance Companies in their own personal interests and contrary to the best interests of the Insurance Companies" by diverting money from the Insurance Companies to the Parent Companies and the Downstream Affiliates.

The Court briefly summarizes below the transactions and other conduct the Liquidator claims demonstrates the existence of an illegal conspiracy to divert money from the Insurance Companies to Engle-controlled entities.

- In 1991 and 1992, Engle, Glenn J. Kennedy, Richard A. Leonard and the then-serving Director Defendants allegedly caused $7,600,000 to be transferred from Coronet to Acton/Sunstates through two Downstream Affiliates, Sunstates Equities and Sunstates Financial. The payments were ostensibly made to satisfy debts Sunstates Equities and Sunstates Financial owed

---

[4](...continued)
supra) has been a principal with Schuyler Roche. Also, Schulyer Roche has served as counsel to the Insurance Companies at times relevant to this matter.

Acton/Sunstates. The Liquidator claims the debts never existed.

- Between 1991 and 1995, the Insurance Companies transferred approximately $50,000,000 to three Downstream Affiliates, Sunstates Equities, Sunstates Financial and Coronet Financial, who thereafter transferred approximately $22,000,000 to the Parent Companies, allegedly in satisfaction of payables owed by them to the Parent Companies. The Liquidator claims that the Insurance Companies were the only source of cash for the Downstream Affiliates involved and further claims that the Downstream Affiliates could not have made the transfers to the Parent Companies without cash from the Insurance Companies.

- Between 1990 and 1995, Engle, Kennedy, Leonard and the then-serving Director Defendants caused two Downstream Affiliates, Sunstates Equities and Pensacola Holding, to pay over $6,000,000 in "management fees" to various Parent Companies, including Acton/Sunstates, Telco and Hickory Furniture. The Liquidator claims that any money paid by Sunstates Equities and Pensacola Holding was, in reality, the Insurance Companies' money because neither Sunstates Equities nor Pensacola Holding had any source of cash other than the Insurance Companies. The Liquidator further claims that the purported "management fees" paid to the Parent Companies were unnecessary because Coronet employees had the necessary skill and experience to provide whatever management services the Parent Companies provided Sunstates Equities and Pensacola Holding.

- Between 1990 and 1995, Engle caused the Insurance Companies and Sunstates Equities to purchase over $24,000,000 of securities in certain

- 8 -

Parent Companies, including Acton/Sunstates, Hickory Furniture, Indiana Financial and Wisconsin Real Estate. Although the Insurance Companies "directly" purchased only $3,400,000 of these securities, the remaining $20,600,000 of securities purchased by Sunstates Equities was made using money the Insurance Companies transferred to Sunstates Equities. The Liquidator alleges that, prior to the securities purchases, the Parent Companies were performing poorly and that the cash infusions allowed Engle and others to "consolidate and maintain their control" over the Parent Companies.

For each of the above-listed transactions, the Liquidator claims that the transfers of money from one or more of the Insurance Companies ultimately to the Engle-controlled Parent Companies were in essence dividends and should have been reported as such. The Liquidator further alleges that each of the above-listed transfers was made at a time when, because of their reduced surplus and poor operating results, the Insurance Companies could not have legally paid dividends without the approval of the Illinois Department of Insurance. Finally, the Liquidator claims that for each of the above-listed transactions, one or more of the Insurance Companies' audited financial reports falsely reported that no dividends were paid for the years of the respective transfers and falsely treated the transfers of money from the Insurance Companies to certain Downstream Affiliates as investments in affiliates, rather than as dividends or distributions.

The alleged conspiracy also involved the following activities:

- 9 -

- In 199?, certain of Coronet's wholly-o ed subsid ies were caused to borrow $10, ),000 from LaSalle National Bank. This loan was allegedly secured by stock in three publicly-traded companies. The Liquidator claims that in December 1995, Engle caused the loan to be renewed in the amount of $12,500,000, still secured by the publicly-traded companies' stock, and thereafter, in February 1996, Kennedy directed $3,000,000 of the renewed loan proceeds to be distributed to Sunstates Financial. The Liquidator also alleges that Kennedy further ordered the $3,000,000 to be paid by Sunstates Financial back to Coronet as a reduction in principal in Sunstates Financial bonds held by Coronet. The Liquidator claims that the net result of these transactions was that Coronet subsidiaries pledged their assets as security on loan proceeds that were ultimately used to repay Sunstates Financial's preexisting financial obligations to Coronet.

- Between February 1993 and December 1994, Engle caused Coronet and two Downstream Affiliates, Sunstates Equities and Coronet Financial, to purchase at least $2,200,000 worth of artwork, jewelry and other collectibles, including rare books and oriental rugs. These items were allegedly billed to Coronet, but maintained and utilized by Engle and his wife at their personal residence. The Liquidator claims that Sunstates Equities and Coronet Financial had few sources of cash other than the Insurance Companies and that Engle used the Insurance Companies' money to purchase the luxury items noted above.

- In November 1996, Engle, Kennedy and the then-Boards of Directors of the Insurance Companies conspired to strip Coronet of its assets in anticipation of the Illinois Department of Insurance

placing the Insurance Companies in conservation. These actions, which allegedly took place between November 4 and 29, 1996, came in response to letters and Corrective Orders from the Illinois Department of Insurance in which the department expressed concern over the Insurance Companies' relationships with other Engle-controlled companies. Included in these correspondence was a January 23, 1996 letter ("the January 23 Letter"), in which Illinois Department of Insurance regulators ordered the Insurance Companies to notify them, on a monthly basis, of all sales and purchases of investments by the Insurance Companies. The Liquidator further claims that Kennedy sought to "disguise the illegality" of several transactions between the Insurance Companies and other Engle-controlled entities by back-dating the effective date of those transactions. Finally, the Liquidator alleges that Engle, Kennedy and the then-Boards of Directors of the Insurance Companies devised a "Disaster Plan" that they would carry out should it become clear that the Illinois Department of Insurance was going to place the Insurance Companies in conservation.

- The Liquidator alleges that, consistent with the "Disaster Plan" noted above, Engle and the then-Boards of Directors of the Insurance Companies caused Coronet to surrender $6,427,296.25 in bonds and preferred stock of Sunstates Equities, Sunstates Financial, Alba Holdings and RMHC. The Liquidator claims Coronet received nothing in return and recorded the transactions as "contributions to paid-in capital" of those companies. Finally, the Liquidator asserts that the so-called contributions were not reported to insurance regulators as required by applicable administrative orders.

- 11 -

- The Liquidator alleges that, prior to November 6, 1996, the Insurance Companies owned 100% of certain Downstream Affiliates, namely, Sunstates Equities, Sunstates Financial, RMHC, Wellco Holdings and Alba Holdings. The Liquidator further alleges that on November 6, 1996, approximately three weeks after the Illinois Department of Insurance issued Corrective Order No. 96-02, which prohibited disbursements or transactions between any of the Insurance Companies and any other Engle-controlled company, Engle and his control group caused Sunstates Equities, Sunstates Financial, RMHC, Wellco Holdings and Alba Holdings to issue additional common stock to other Engle-controlled companies so as to reduce the Insurance Companies' interests in the involved Downstream Affiliates.[5]

- The Liquidator alleges that prior to June 30, 1996, the Insurance Companies owned bonds issued by Sunstates Equities and Sunstates Financial and that

---

[5]     The Liquidator alleges that the Insurance Companies' interests in certain of the Downstream Affiliates have been reduced, as follows: Acton/Sunstates purports to own 58.5% of Sunstates Equities and contends that the ownership interests of Coronet, National Assurance and Crown Casualty in Sunstates Equities have been reduced to 6.4%, 28.7% and 6.4% respectively; Sew Simple purports to own 59% of Sunstates Financial and contends that the ownership interests of Coronet, National Assurance and Crown Casualty in Sunstates Financial have been reduced to 22.6%, 14.7% and 3.7% respectively; Wellco Holdings purports to own 51.4% and Sew Simple purports to own 38.7% of RMHC and both contend that the ownership interests of Coronet, National Assurance and Crown Casualty in RMHC have been reduced to 7.8%, 1.2% and 0.9% respectively; Sew Simple purports to own 90% of Wellco Holdings and contends that Coronet's ownership interest has been reduced to 10%; and Sew Simple purports to own 8.8%, Sunstates Equities purports to own 1% and Rocky Mountain purports to own 70.2% of Alba Holdings and the three companies contend that Coronet's ownership interest has been reduced to 20%.

in July, 1996, certain "Defendants," including Leonard and Mortenson, caused $1,156,453 of those bonds to "be surrendered without any consideration as 'capital contribution' to the issuers." The Liquidator further alleges that, also in July 1996, certain "[D]efendants" caused an additional $991,293 of the same bonds to be redeemed in exchange for other bonds issued by Sunstates Equities and Sunstates Financial, which in turn were replaced by shares of those companies' common stock. Finally, the Liquidator claims that the Insurance Companies did not report the so-called "capital contributions" as required by the January 23 Letter.

- The Liquidator alleges that prior to June 30, 1996, Crown Casualty and National Assurance owned preferred stock in Sunstates Equities and Sunstates Financial and that on or about July 31, 1996, Engle caused Crown Casualty and National Assurance to "surrender" approximately $343,998 worth of such preferred stock, without receiving any consideration in return. The Liquidator further alleges that the "surrenders" were not reported to the Illinois Department of Insurance as required by the January 23 Letter.

- The Liquidator claims that, at all times relevant to this lawsuit, the Insurance Companies owned The Springs, Inc., an entity which owned The Springs Resort, a golf course and hotel resort in Wisconsin, and at least 73 undeveloped residential lots adjacent to the Springs Resort, with a market value of approximately $4.8 million. The Liquidator further alleges that on November 14, 1996, "Engle and his control group" caused The Springs, Inc. to transfer 65 of the undeveloped lots to Sunstates Realty and Sew Simple, purportedly as cancellation of an inter-company debt in the amount of $2,533,847.

- 13 -

Finally the Liquidator claims that, as a resr of this transfer, the Insurance Companies lost valuable real estate without obtaining reasonably equivalent value in exchange (or may not have received any value at all).

## C. The Liquidation of the Insurance Companies

In late 1996 and early 1997, each of the Insurance Companies was declared insolvent and ordered into liquidation by the Circuit Court of Cook County, Illinois, as follows: Coronet on December 24, 1996; Crown Casualty on January 31, 1997; and National Assurance on January 3, 1997 (collectively "the Liquidation Orders"). The Coronet liquidation is currently proceeding in the Circuit Court of Cook County, Illinois, Chancery Division, under the caption In the Matter of the Liquidation of Coronet Insurance Company, 96 CH 13422.

The Coronet Liquidation Order appoints the Director of Insurance of the State of Illinois as Liquidator of Coronet, vests in him "title to all property, assets, contracts and rights of action of" Coronet, and authorizes him "to deal with the property, assets, business and affairs of Coronet, and to sue and defend for Coronet, or for the benefit of Coronet's policyholders and creditors, in the courts in his name as the Liquidator or in the name of Coronet." The Liquidator claims that policyholders and creditors of the Insurance Companies have filed "thousands of claims" against the Insurance Companies' estates and that he is "marshaling assets

- 14 -

and determining the merit of the claims pursuant to the procedure set forth in the [Illinois] Insurance Code and the Liquidation Order[s]."

## D.    Shapo's Third Amended Complaint

After this Court dismissed Shapo's second amended complaint, Shapo, solely in his capacity as statutory and court-affirmed Liquidator of the Insurance Companies, filed a twelve count third amended complaint against Engle, Kennedy, Leonard, the Director Defendants (see note 1 supra), the Parent Companies (see note 2 supra), the Downstream Affiliates (see note 3 supra), and Schuyler Roche (see note 4 supra). Shapo brings the third amended complaint solely on behalf of and for the benefit of the Insurance Companies. In total, the Liquidator seeks from Defendants over $70 million in actual damages, together with treble damages under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, et seq. ("RICO"), attorneys' fees and punitive damages.

Counts I and II of the Liquidator's third amended complaint allege violations of RICO. Specifically, Count I asserts that Engle, Kennedy, Leonard, Mortenson, Friedman, and the Parent Companies (other than Acton/Sunstates) (collectively, the "RICO persons"), through their association with Acton/Sunstates and/or Coronet, violated §1962(c) of RICO by engaging in a pattern of racketeering activity, in violation of federal law, including, but not limited to, "a scheme to defraud Coronet

by looting cash and other assets of the Insurance Companies that would have been used to pay policyholder claims" and a scheme "to deceive insurance regulators and others by concealing and misrepresenting material facts from them about the looting" of cash and other assets of the Insurance Companies. The Count I named Defendants allegedly made the misrepresentations in Annual Statements filed with the Illinois Department of Insurance, as well as invoices, Holding Company Registration Statements and memos, certain of which were allegedly sent using the mails, private or commercial carriers, and wires.

Count II alleges that Engle, Kennedy, Leonard, Friedman, the Parent Companies (other than Acton/Sunstates), and the Director Defendants conspired to participate in the above described illegal conduct through a pattern of racketeering activity. The Liquidator claims that the Director Defendants "facilitated the illegal schemes by, at least, knowingly approving or ratifying one or more of the illegal transactions that occurred during the period of his directorship."

Count III alleges that Engle and the Director Defendants breached their fiduciary duties to the Insurance Companies and their respective policyholders by, inter alia, devising and directing the above described transactions while knowing that such transactions were contrary to the interests of the Insurance Companies and their policyholders, approving or ratifying such illegal transactions, and failing to

properly investigate whether such transactions were in the interest of the Insurance Companies and their policyholders.

Count IV and V allege claims against Schuyler Roche and Friedman for malpractice and breach of the attorneys' duty of loyalty.

In Count VI, Shapo alleges that Kennedy, Leonard, and each of the Director Defendants knowingly participated in the plan, masterminded by Engle, to loot the Insurance Companies of their cash and other assets by, inter alia: "approving, executing or otherwise assisting with many of the documents prepared in connection with the illegal transactions" described above; permitting and "condoning" the entry of misleading information about the illegal transactions into the Insurance Companies' records; permitting and "condoning" the falsification of the transactions described above in the Insurance Companies' records and in materials filed with the Illinois Department of Insurance; and "approving, ratifying or otherwise assisting with" each of the illegal transactions described above.

Count VII alleges that Engle's transfer of approximately $2.2 million worth of Coronet-owned artwork, jewelry and other collectibles, including rare books and oriental antiques, to himself and his wife constituted conversion of these items and injured Coronet and its policyholders.

Count VIII asserts that Engle, Kennedy, Leonard, the Parent Companies, the Downstream Affiliates, and the Director Defendants engaged in a civil conspiracy

by agreeing and combining for the purpose of accomplishing concerted action an unlawful purpose." Shapo also claims that the Count VIII named defendants "committed multiple tortious acts over many years consisting of looting and conversion of cash and other assets of the Insurance Companies."

Count IX alleges that Engle, Kennedy, Leonard, Brown, Mortenson, Friedman, Sisson, Spiller, Action/Sunstates, Sunstates Equities, Sunstates Financial, Sew Simple, Wellco Holdings, RMHC, Alba Holdings and Sunstates Realty violated certain provisions of the Corrective Orders issued by the Illinois Department of Insurance in October 1995 and October 1996, and violated the Illinois Insurance Holding Company Systems Act, 215 ILL. COMP. STAT. ANN. 5/131.1, et seq. (West 1994), through certain acts, specified in the third amended complaint, that allegedly "rendered the Insurance Companies' surplus as regards policyholders unreasonable in relation to the Insurance Companies' outstanding liabilities and inadequate to their financial needs."

Count X seeks a declaratory judgment establishing the Insurance Companies' respective interests in certain Downstream Affiliates, as set forth more fully above. See note 5 supra. Count XI seeks an order requiring Sunstates Equities, Sunstates Financial, RMHC, Wellco Holdings, and Alba Holdings to provide the Liquidator with a full and complete accounting of their respective financial condition and operations, including, but not limited to, all transactions that purport to have

- 18 -

diminished the Insurance Companies' respective ownership interests in each company.

Finally, Count XII seeks an order finding Acton/Sunstates, Sunstates Equities, Sunstates Financial, Sew Simple, Wellco Holdings, RMHC, Sunstates Realty and Alba Holdings, through their participation in certain transactions set forth in the third amended complaint, violated the Uniform Fraudulent Transfer Act, 740 ILL. COMP. STAT. ANN. 160/1, et seq. Shapo also seeks an order voiding the specified transactions and restoring the Insurance Companies' respective interests in certain companies to the levels prior to the challenged transactions.

### E. The Present Motions to Dismiss

The Court presently considers the following two motions: (1) Engle's motion to dismiss the third amended complaint, which specifically attacks the Liquidator's Count I and II RICO claims, and incorporates fully the memorandum and arguments of Certain Former Directors, Officers, and Corporate Defendants in support of their motion to dismiss Counts I-III, VI, and VIII-XII, and; (2) the motion of Mortenson, Sisson, Spiller, Kennedy, Leonard, Albritton, Telco, RDIS, Hickory Furniture, Indiana Financial, Acton/Sunstates, Normandy Insurance, Sew Simple, Sunstates Equities, Sunstates Financial, Alba Holdings, RMHC, and Wellco Holdings, Sunstates Realty ("Certain Former Directors, Officers, and Corporate Defendants"

- 19 -

and collectively, the "Gro[ ] Defendants") to dismiss Counts I-[ ], and VIII-XII. Before addressing the motions to dismiss, the Court sets forth the legal standard guiding the evaluation of the claims.

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. A defendant must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted. In ruling on a motion to dismiss, the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. Bontkowski v. First Nat'l Bank of Cicero, 998 F.2d 459, 461 (7th Cir. 1993), cert. denied, 510 U.S. 1012, 126 L.Ed.2d 567, 114 S.Ct. 602 (1993). The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 2 L.Ed.2d 80, 78 S.Ct. 99 (1957). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992),

cert. denied, 506 U.S. 89, 121 L.Ed.2d 196, 113 S.Ct. 267 (1992). With these principles in mind, the Court evaluates Defendants' motions.

## DISCUSSION

### I. Engle's Motion to Dismiss the RICO Counts I and II

Engle argues that the RICO Count I claim brought under §1962(c) and the RICO Count II claim brought under §1962(d) and based upon a purported conspiracy to violate §1962(c) should be dismissed because there is no viable RICO enterprise. Specifically, Engle argues: (1) Shapo's primary theory that Coronet constituted the RICO enterprise fails to allege an enterprise that is distinct from the victim; (2) Shapo's alternative theories that Acton/Sunstates or a putative "association-in-fact" constitute other RICO enterprises are unsupported by the third amended complaint and fail to allege an enterprise distinct from the RICO person; and (3) Shapo's RICO claims are preempted by state insurance law pursuant to the McCarran- Ferguson Act.

In order to state a claim under RICO, Shapo must allege that a person is (1) employed by or associated with (2) an enterprise (3) engaged in or affecting interstate commerce, (4) where that person conducts or participates in a pattern of racketeering activity. See, e.g., U.S. v. Palumbo Brothers, Inc., 145 F.3d 850, 867 (7th Cir. 1998).

- 21 -

## A. Enterprise as Victim 

Engle argues that Shapo's RICO claims are flawed because Shapo names Coronet as both the enterprise and the victim. Engle claims that the RICO counts should be dismissed because an enterprise cannot also be a victim for purposes of §1962(c) claims and §1962(d) claims based thereon. Shapo, however, contends that an enterprise is not precluded from also being the victim, and so, he has properly laid out claims under §§1962(c) and (d).

The caselaw is unsettled on this issue. The Seventh Circuit in U.S. v. Kovic, 684 F.2d 512 (7th Cir. 1982), cert. denied, 459 U.S. 972, 74 L.Ed.2d 284, 103 S.Ct. 304 (1982), has previously held that an enterprise may be a victim for purposes of §1962(c). See id. at 517. However, the United States Supreme Court may have been questioning this proposition without overruling it when it said in National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 259, 127 L.Ed.2d 99, 114 S.Ct. 798, 804 (1994), "the 'enterprise' in subsection (c) connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity." Id. The Supreme Court, nevertheless, noted without disapproval a commentator's conclusion that an enterprise may be a victim. See id., citing Blakey, The RICO Civil Fraud Action in Context: Reflections on Bennet v. Berg, 58 NOTRE DAME L. REV. 237, 307-325 (1982).

- 22 -

In light of the Supreme Court's statement, the Seventh Circuit in <u>LaSalle Bank Lake View v. Seguban</u>, 54 F.3d 387, 393 (7th Cir. 1995), questioned whether <u>Kovic</u> still controlled, but did not intimate that <u>Scheidler</u> prescribed a reversal of <u>Kovic</u>. On remand to the Northern District of Illinois, the district court held that the Supreme Court's decision in <u>Scheidler</u> did not prohibit an enterprise from also being a victim under §1962(c). See <u>LaSalle Bank Lake View v. Seguban</u>, 937 F. Supp. 1309, 1323 (N.D. Ill. 1996) (Norgle, J.) [hereinafter <u>Seguban II</u>]. In reaching this conclusion, the district court rejected a Third Circuit decision which interpreted <u>Scheidler</u> as prohibiting an enterprise from being a victim for purposes of §1962(c). See <u>id</u>.; <u>Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.</u>, 46 F.3d 258, 267 (3d Cir. 1995). The court in <u>Seguban II</u> refused to make the "leap of logic" that the Supreme Court's statement that "generally" an "enterprise" is not a victim, dictated the conclusion that an enterprise "cannot" be a victim. See <u>Seguban II</u>, 46 F.3d at 1323. Likewise, in <u>Hewitt Associates v. Zerba</u>, No. 96 C 2428, 1996 U.S. Dist. LEXIS 18206 (N.D. Ill. Nov. 25, 1996) (Conlon, J.), another court in this district held that the Supreme Court's decision in <u>Scheidler</u> did not mandate a reversal of <u>Kovic</u>'s holding that an enterprise may be a victim. See <u>Hewitt Associates</u>, 1996 U.S. Dist. LEXIS 18206, at *14.

This Court agrees with the other courts in this district. The Supreme Court made its statement in <u>Scheidler</u> in the context of discussing whether an enterprise

- 23 -

needs to have an economic motive for §1962(c) purposes. See Scheidler, 510 U.S. at 804. This Court does not conclude that the Supreme Court, by stating in the circumstances of the Scheidler discussion that generally an enterprise is not a victim, intended to foreclose the possibility that an enterprise may be a victim under §1962(c). See also Hansel 'n Gretel Brand, Inc. v. Savitsky, No. 94 Civ. 4027, 1997 WL 543088, at * 3 (S.D.N.Y. Sept. 3, 1997) (the language of Scheidler was not intended to prescribe a blanket rule). Consequently, Shapo's RICO claims do not fail inasmuch as they name Coronet as both the enterprise and the victim, and the Court denies Engle's motion to dismiss on this basis.

## B. Sunstates or an Association-in-Fact as an Enterprise

Engle next attacks Shapo's alternate RICO theories as failing to establish viable RICO enterprises because the proposed enterprises either were not alleged to have been conducted through a pattern of racketeering or are not distinct from the RICO person.

### 1. Acton/Sunstates as an Enterprise

Engle argues that Acton/Sunstates cannot be a proper enterprise because none of the alleged predicate acts of racketeering are alleged to have been made through Acton/Sunstates. Rather, according to Engle, the RICO persons allegedly

committed all the predicate acts through Coronet, and these predicate acts cannot be attributed to Acton/Sunstates merely because it is a parent company of Coronet. Engle does not contend that Acton/Sunstates cannot be an enterprise per se, but that in this action Acton/Sunstates is not an enterprise through which predicate acts of racketeering were conducted. The Court agrees.

Once a claimant adequately identifies an enterprise, the claimant must also establish that the RICO persons associated with the enterprise conducted or participated, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity. See Richmond v. Nationwide Cassel L.P., 52 F.3d 640, 646 (7th Cir. 1995). Nevertheless, Shapo nowhere alleges any predicate acts of racketeering activity apart from those committed by the RICO persons in their association with Coronet. Shapo seems to mention Acton/Sunstates as a possible enterprise because the RICO persons are associated with it and as a corporation Acton/Sunstates is eligible to be an enterprise. Shapo alleges that receipt of allegedly illicit cash from the Insurance Companies and causing subsidiaries to file financial statements which concealed those cash receipts is sufficient to permit RICO enterprise status. Affirmative acts of mail and wire fraud participation are not ascribed to Acton/Sunstates. Shapo's focus is on the RICO persons conduct of the Insurance Companies' affairs and not on Acton/Sunstates.

- 25 -

The third amended complaint is legally insufficient to attribute enterprise status to Acton/Sunstates.

## 2. The Association-in-Fact Enterprise

Engle claims that an association-in-fact comprised of Engle, Kennedy, Leonard, Mortenson, Friedman, Acton/Sunstates, the Parent Companies, and the Downstream Affiliates (the "Association-In-Fact"), cannot be a viable enterprise because it is not distinct from the RICO persons and because none of the alleged predicate acts of racketeering are alleged to have been made through it.

For the same reason that Acton/Sunstates is not a proper enterprise in this RICO action, the Association-In-Fact also fails to qualify as a proper enterprise. Shapo does not allege facts demonstrating that the RICO persons conducted or participated in the conduct of the affairs of the Association-In-Fact through a pattern of racketeering activity. Rather, Shapo only alleges facts illustrating that the RICO persons engaged in a mail and wire fraud in the conduct of the affairs of the Insurance Companies, and not of the Association-In-Fact, which does not include the Insurance Companies. Consequently, the Association-In-Fact is not a proper enterprise in this RICO action.

## C. McCarran-Ferguson Act Preemption



Engle argues that Shapo cannot bring his RICO claims because the McCarran-Ferguson Act precludes application of a federal law when it would "invalidate, impair, or supersede" any state law regulating the business of insurance. Shapo claims that the application of RICO to this action does not frustrate any state law regulating insurance, and so, the McCarran-Ferguson Act would not prevent the application of RICO to this action.

The McCarran-Ferguson Act provides in relevant part, "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, ... unless such Act specifically relates to the business of insurance." 15 U.S.C. §1012(b). Two recent decisions interpreting the McCarran-Ferguson Act guide the Court's analysis in determining that the McCarran-Ferguson Act is inapplicable to this action.

In Autry v. Northwest Premium Services, Inc., 144 F.3d 1037 (7th Cir. 1998), the Seventh Circuit set out a three part test, consisting of three inquiries, to evaluate a preemption claim under the McCarran-Ferguson Act. See id. at 1042.

> The three part test requires the following three inquiries: (1) Does the federal statute at issue "specifically relate to the business of insurance"? If so, the standard preemption rules apply and the federal statute is applied. If the federal statute does not "specifically relate to the business of insurance," a court must ask (2) whether the state statute was "enacted ... for the purpose of regulating the business of insurance." If the state law was not enacted for this purpose, then the

- 27 -

court's inquiry end. If, however, the state statute wa enacted, a court must proceed to determine (3) whether application of the federal statute would "invalidate, impair or supersede" the state law. If the federal statute would have one of these effect, then it may not be applied in the face of the state law. On the other hand, if the federal statute would not "invalidate, impair, or supersede" state law, then the federal statute may be applied. Id.

Thus, the Court begins its analysis by asking whether RICO specifically relates to the business of insurance. RICO is not a law that specifically relates to the business of insurance. See Humana Inc. v. Forsyth, 525 U.S. 299, 142 L.Ed.2d 753, 119 S.Ct. 710, 717 (1999). So, the court advances to the second question and asks whether the state statute in issue was enacted "for the purpose of regulating the business of insurance."

Engle alleges that the specific Illinois insurance law frustrated by RICO is §131.25(a) of the Illinois Insurance Code, entitled "Recovery upon order of liquidation or rehabilitation of domestic insurer," 215 ILL. COMP. STAT. ANN. 5/131.25(a). Section 131.25(a) provides:

> ...the receiver shall have the right subject to the limitations set forth in subsections (b) and (c) of this Section to recover on behalf of the insurer any or all of the following made during the 3 years before the filing of the petition for liquidation, conservation, or rehabilitation:
> (1) From any parent corporation, holding company, person, or affiliate who otherwise controlled the insurer, the amount of distributions, other than distributions of shares of the same class, paid by the insurer on its capital stock.
> (2) From any director, officer, or employee, the amount of any payment in the form of a bonus, termination, settlement, or

extraordinary lump 'm salary adjustment made by the ther or a subsidiary. 215 ILL. COMP. STAT. ANN. 5/131.25(a).

In determining whether this statute was enacted for the purpose of regulating the business of insurance, the court looks to see if it is a law "aimed at protecting or regulating [the] relationship [between insurer and insured], directly or indirectly." See Autry, 144 F.3d at 1044, quoting SEC v. National Sec., Inc., 393 U.S. 453, 460, 21 L.Ed.2d 668, 89 S.Ct. 564 (1969). The core of the "business of insurance" is "the relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation and enforcement." Autry, 144 F.3d at 1044, quoting National Sec., 393 U.S. at 460.

With this in mind, the Court concludes that §131.25(a) is not a statute enacted "for the purpose of regulating the business of insurance." Section 131.25(a) addresses the relationship between the receiver administering a liquidation order and any parent corporation, holding company, person, or affiliate who otherwise controlled the insurer and any director, officer, or employee of the insurer. See 215 ILL. COMP. STAT. ANN. 5/131.25(a). Section 131.25(a) does not address the relationship between the insurance company and a policyholder. See id.; see also Autry, 144 F.3d at 1044.

The proper inquiry is whether §131.25(a) was "enacted for the purpose of regulating the business of insurance," and "not whether the activity the statute

- 29 -

regulates may properly be considered the 'business of insurance.'" Autry, 144 F.3d at 1045. As in Autry where the court determined that the Illinois law was not enacted for the purpose of regulating the business of insurance, §131.25(a) may "serve to protect someone who happens to be an 'insured,' but it does not protect that person in his capacity as a party to a contract of insurance." See Autry, 144 F.3d at 1044. Rather, §131.25(a) regulates a receiver's right to recover certain distributions on capital stock, bonuses, termination settlements, and lump sum salary adjustments on behalf of the insurer after an entry of an order for liquidation or rehabilitation. See 215 ILL. COMP. STAT. ANN. 5/131.25(a).

Because §131.25(a) "does not possess an end, intention, or aim of directing, managing, or controlling the relationship between the insurance company and the policyholder," the Court concludes that it was not enacted "for the purpose of regulating the business of insurance. Id. Thus, the McCarran-Ferguson Act is inapplicable to this action and does not preclude the application of RICO.

Alternatively, even if §131.25(a) were enacted "for the purpose of regulating the business of insurance," RICO does not "invalidate, impair or supersede" the Illinois insurance law. In Humana Inc. v. Forsyth, the United States Supreme Court recently interpreted the McCarran-Ferguson Act to hold that "when federal law does not directly conflict with state regulation, and when application of the federal law

would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." Humana, 119 S.Ct. at 717.

In the instant case, RICO does not directly conflict with §131.25(a). RICO protects against injury from racketeering activity, including mail and wire fraud, whereas §131.25(a) allows a receiver of a liquidated insurance company to recover certain distributions paid on the insurer's capital stock or recover for certain bonus, termination settlement, or lump sum salary adjustment payments. Section 131.25(a) says nothing about the receiver's ability to recover under other legal theories, nor does it preclude such recovery. Further, the Illinois Insurance Code contemplates that a liquidator will pursue actions based on laws outside of the Illinois Insurance Code. See 215 ILL. COMP. STAT. ANN. 5/193. Section 131.25(a) merely provides for one specific form of recovery in situations where an insurance company has been liquidated. It seems that RICO is compatible with §131.25(a) and complements and enhances the Illinois law rather than frustrating it. See also Humana, 119 S.Ct. at 714.

Because RICO does not conflict with or frustrate §131.25(a), the McCarran-Ferguson Act is, for this additional reason, inapplicable to this action as a bar to RICO claims.

## II. Group Defendants' Motion to Dismiss

The Group Defendants move to dismiss Counts I-III, VI, and VIII-XII of the third amended complaint, alleging that: Shapo fails to meet the requirements of Federal Rules of Civil Procedure 8(a) and 9(b); that Shapo's RICO claims must fail for lack of a viable enterprise and because no predicate acts of racketeering, no pattern of racketeering, and no conspiracy has been adequately alleged; that Shapo's RICO claims are pre-empted by the McCarran-Ferguson Act; that Shapo has failed to adequately assert damages, and; that the pendant state claims fail to adequately allege claims.

### A. Failure to Meet the Requirements of Rules 8(a) or 9(b)

The Group Defendants claim that Shapo has neither established any misconduct by them nor stated his RICO claims with particularity as required by Federal Rules of Civil Procedure 8(a) and 9(b). Shapo maintains that he has met all of the pleading requirements.

Shapo's RICO claims are predicated on acts of mail and wire fraud committed in the conduct of the Insurance Companies. Allegations of fraudulent acts in RICO actions must meet the notice pleading requirement of Rule 8(a) and the particularity requirement of Rule 9(b). See, e.g., P&P Marketing, Inc. v. Ditton, 746 F. Supp.

1354, 1361 (N.D. Ill. 199 ) In order to state a sufficient claim, the claimant must merely provide a general outline of the alleged fraud scheme, which is sufficient to reasonably notify the defendants of their purported role in the scheme. <u>See</u> <u>Pelfresne v. Village of Rosemont</u>, 22 F. Supp.2d 756, 763 (N.D. Ill. 1998). However, the allegations of fraud must consist of facts describing the time, place, and contents of the false representations, and the full nature of the transaction and scheme to defraud, including the identities of the persons making the representation and the manner of the communication. <u>See</u> <u>P&P Marketing</u>, 746 F. Supp. at 1361. It is unnecessary for the claimant to allege evidentiary details that he will employ to support the fraud claim at a later date. <u>See</u> <u>Banowitz v. State Exchange Bank</u>, 600 F. Supp 1466, 1469 (N.D. Ill. 1985). Where there are multiple defendants, the complaint must notify each defendant of the specific act purportedly committed by the defendant, which justifies that defendant's inclusion in the particular count. <u>See</u> <u>P&P Marketing</u>, 746 F. Supp. at 1362. Nevertheless, where the named defendants are corporate insiders or control the actions of an entity, this requirement may be relaxed, especially when the defendants are in a better position to know the extent of each defendant's participation in the complained conduct. <u>See</u> <u>id</u>. In such situations a complaint may be sufficient if it describes the fraudulent acts and provides the individuals with adequate information to answer the allegations. <u>See</u>

- 33 -

Banowitz, 600 F. Supp. at 69. Moreover, to properly allege that defendants were engaged in acts to defraud, the claimant must allege that defendants were involved in the "deprivation of something of value by trick, deceit, chicane, or overreaching." U.S. v. Altman, 48 F.3d 96, 102 (1995).

Certain former directors, Officers, Parent Companies, and Downstream Affiliates comprise the Group Defendants in this motion to dismiss. However, Shapo's claims do not equally implicate them and do not apply to each of them in the same way. As such, the Court will first address the claims against the Parent Companies and Downstream Affiliates, and then proceed separately to each fraud allegation attacked as it applies to the Former Directors and Officers.

### 1. Parent Companies and Downstream Affiliates

Shapo alleges that the Parent Companies and Downstream Affiliates participated in the fraudulent acts of the RICO persons. Shapo claims that certain directors and officers transferred cash and assets of the Insurance Companies to various Parent Companies or Downstream Affiliates and then caused the Downstream affiliates to sometimes transfer cash and assets received from the Insurance Companies to the Parent Companies.

- 34 -

Two cases in this district have found that vicarious liability attaches to a corporation for the intentional acts of its agents under §§1962(c) and (d) only where the corporation is actually the "central figure" or "aggressor" in the alleged scheme. See Nystrom v. Associated Plastic Fabricators, Inc., No. 98 C 134, 98 C 4282, 1999 WL 417848, at *8 (N.D. Ill. June 18, 1999); Aspacher v. Kretz, No. 94 C 6741, 1997 WL 692943, at *12 (N.D. Ill. Aug. 13, 1997). The courts decided those cases with respect to corporations which were unrelated to the RICO enterprise and which did not directly benefit from the fraudulent RICO acts or from their connections with the RICO enterprise. See Nystrom, 1999 WL 417848; Aspacher, 1997 WL 692943. The Court is not convinced that the reasoning in those cases is applicable to the circumstances of this case where the relationship of the Parent Companies and Downstream Affiliates to the RICO enterprise seems to have facilitated the perpetration of the fraudulent acts and where the Parent Companies and Downstream Affiliates may have directly benefitted from the fraudulent RICO acts. Moreover, whether a corporation acted as an "aggressor" or a "central" figure in a RICO scheme is a question of fact, which the Court cannot resolve from the pleadings.

- 35 -

Thus, the Court presently finds that Shapo has sufficiently alleged that the Parent Companies and the Downstream Affiliates participated in the underlying fraud in a manner and under circumstances that could subject them to RICO liability. Consequently, Shapo has stated a claim against the Parent Companies and Downstream Affiliates, and the Court denies the motion to dismiss the underlying fraud claims with respect to these entities.

### 2. Certain Former Directors and Officers

### a. Dividend Payments

The Group Defendants assert that Shapo does not sufficiently identify any improper dividend transfers or the parties to those transfers. The Court disagrees.

Shapo asserts that Engle, Kennedy, Leonard, and the then-serving Director Defendants caused Coronet to engage in certain transactions involving specified dollar amounts. Shapo sets forth various transfers of cash and assets, which he alleges should have been labeled as "dividends" but were instead paid out as capital contributions from Coronet to various other affiliates and parent companies. Shapo alleges that certain defendants "disguised" the transfers as "capital contributions" when they should have been reported as dividend distributions because they were payments made with cash and other assets of Coronet. According to Shapo, Coronet

could not have legally paid these dividends without approval of the Illinois Insurance Department because of Coronet's reduced surplus position and poor operating results. Further, Shapo claims that Coronet's annual audited financial reports falsely treated the transfers as investments rather than reporting them as dividends.

Shapo has described the fraudulent transfers with enough specificity to allow adequate responsive pleading. As such, the Court finds that Shapo has met the requirements of Rules 8(a) and 9(b).

### b. Disguised Management Fees

Shapo further claims that Engle, Kennedy, Leonard and the then-serving Director Defendants caused Sunstates Equities and Pensacola Holding to pay approximately $6 million to various Parent Companies, including Acton/Sunstates, Telco, and Hickory Furniture, and disguised these payments as "management fees" when they should have been labeled as "dividends" because the payments were essentially transfers of cash and assets between the Parent Companies and the these Downstream Affiliates. Shapo alleges that Sunstates Equities and Pensacola Holding were not able to pay the management fees without accepting large transfers of cash and assets from the Insurance Companies, and that basically, the management fees

were a pretense to simply transfer money between the Insurance Companies and the Parent Companies.

Shapo does not attack whether management services were in fact rendered, rather he takes issue with the transfers made between the Insurance Companies and Sunstates Equities and Pensacola to pay for the management fees. Shapo argues that these transfers from the Insurance Companies were essentially dividends because they involved a transfer of cash or assets. According to Shapo, the Insurance Companies were supposed to report these transfers as dividends, and would not have been able to make these dividend payments because of the Insurance Companies' reduced surplus and poor operating results. Moreover, the Insurance Companies in their annual reports falsely treated these transfers as investments in affiliates rather than reporting them as dividends.

Again, Shapo has described the fraudulent transfers with enough sufficiency to allow adequate responsive pleading. As such, the Court finds that Shapo has met the requirements of Rules 8(a) and 9(b).

### c. Purchase of Securities

The Group Defendants attack Shapo's allegation that Coronet's purchase of securities of various Parent Companies was improper. The Group Defendants

maintain that Shapo has failed to allege how Coronet was harmed by the purchase or how the purchases violated any laws. However, Shapo asserts that the Insurance Companies purchased about $3.5 million of poorly performing Parent Company stock at a time when the Insurance Companies needed money to meet their own obligations to policyholders and to others. According to Shapo such a purchase of Parent Company stock amounted essentially to a transfer of dividends, which would have been prohibited given Coronet's poor operating results and because it would reduce Coronet's surplus position. Shapo seems to adequately claim that the Insurance Companies suffered damage by diverting large amounts of their cash and assets into poorly performing stock, yet Engle purposely caused the Insurance Companies to do so.

Also, Shapo alleges that the Insurance Companies transferred more than $20 million to Sunstate Equities with which Sunstates Equities purchased securities of the Parent Companies. Shapo claims that this transfer was a distribution of dividends and should have been reported and submitted for approval as such to the Illinois Insurance Department, which would not have allowed the transfer because of the Insurance Companies' reduced surplus and poor operating results. Moreover, Shapo asserts that Coronet neither reported its purchase of securities nor the transfer

of cash and assets to Sunstate Equities as dividends in its annual report, and falsely treated the latter as an investment in affiliates.

The Court finds that Shapo has set forth sufficient facts to show that Coronet was harmed by its large purchases of securities of the Parent Companies. As such, Shapo has met the pleading requirements of 8(a) and 9(b).

### d.  The LaSalle Bank Transaction

The Group Defendants attack Shapo's claim that a loan from LaSalle Bank involving Coronet, Sunset Financial, and various Coronet subsidiaries improperly benefitted Sunset Financial, also a subsidiary of Coronet. Shapo alleges that Coronet's subsidiaries pledged valuable assets as security on loan proceeds that were ultimately used to repay Sunstate Financial's preexisting financial obligations to Coronet. As it stands, the Court does not see how Coronet was harmed in this transaction or how Coronet's assets were further "looted" by this transaction. Further, Shapo fails to specify his basis for claiming that this loan transaction was improper.

Because this claim is devoid of specific factual allegations showing that Coronet was defrauded or that the loan was improper, Shapo fails to meet the requirements of 8(a) and 9(b), and the Court dismisses this claim.

### e. Luxury Items

Shapo alleges that Between 1993 and 1994, Engle caused Coronet to purchase certain luxury items for his personal use and also caused Coronet to transfer cash to Sunstate Equities and Coronet Financial so that they too could purchase luxury items for Engle. Shapo claims that the valuables, costing at least $2.2 million were billed to Coronet and mailed and stored at Engle's personal residence for his personal use.

The Court finds that Shapo has sufficiently described acts of wrongdoing that defrauded Coronet of money to enable adequate responsive pleading. Thus, Shapo has met the requirements of Rules 8(a) and 9(b) with respect to this claim.

### f. The 1996 Transactions

The Group Defendants also allege that Shapo's claim that in November 1996 Engle and the then-serving Director Defendants caused Coronet to surrender $6.4 million in bonds and preferred stock of Sunstates Equities, Sunstates Financial, Alba Holdings, and RMHC fails to demonstrate any damage to Coronet. Similarly, the Group Defendants see no harm in the issuance of additional common stock by five Coronet subsidiaries.

However, Shapo alleges that Engle and the then-serving Director Defendants caused Coronet to surrender the bonds and preferred stock to its subsidiaries while receiving nothing in return. Instead, Coronet recorded the transactions as "contributions to the paid-in-capital" to the respective subsidiaries. Further, after making this contribution to its subsidiaries, Coronet lost its total control over these subsidiaries when Engle and his Control Group caused these subsidiaries to issue additional common stock in their companies to the Parent Companies. In this way, Shapo claims, Engle and his Control Group damaged Coronet by diverting assets and control away from Coronet. In executing these transactions, Shapo alleges that the RICO defendants used the mails, faxes, and conducted board meetings over the telephone.

Shapo sufficiently alleges damage and provides adequate facts describing the purported fraud. As such, this claim meets the requirements of Rules 8(a) and 9(b).

## g. The Spring Lots Transactions

Shapo alleges that Engle and his Control Group caused Springs, Inc., a wholly-owned subsidiary of Coronet, to transfer real estate valued at about $4.8 million to Sunstates Realty and Sew Simple for approximately $2.5 million. Apparently, Shapo contends that this transaction involving a Coronet subsidiary and

two Downstream Affiliates somehow defrauded Coronet. Without more, however, the Court fails to see how this allegation supports a claim that Engle and his Control Group defrauded the Insurance Companies. Consequently, this claim cannot stand.

## B. Predicate Acts of Mail Fraud

The Group Defendants argue that none of the misconduct constitutes predicate acts of mail or wire fraud. In order to allege predicate acts of mail and wire fraud, 18 U.S.C. §§1341, 1343, the claimant need not allege that the false representations were sent through the U.S. mails or made through the use of interstate wires. See P&P Marketing, 746 F. Supp. at 1362. The claimant need only allege a scheme to defraud coupled with a mailing or use of interstate wires in furtherance of the scheme. See id. Moreover, the use of the mails or interstate wires does not have to be an essential element of the scheme. See Schmuck v. U.S., 489 U.S. 705, 709, 103 L.Ed.2d 734, 109 S.Ct. 1443, 1448 (1989). It is sufficient for the mailing or use of interstate wires to be "incident to an essential part of the scheme, or a step in the plot." Id.

Shapo has sufficiently alleged a scheme to defraud, in which Engle and his Control Group, which includes Kennedy, Leonard, Friedman, and the Director Defendants during the times coinciding with their association with the Insurance

- 43 -

Companies, looted money from the Insurance Companies through various fraudulent transfers and transactions. Shapo also provides that these defendants mailed or faxed letters and memos to various people associated with the Insurance Companies in executing their scheme and conducted some of their meetings in which they discussed their scheme over the telephone. Further, Shapo claims that in order to cover up these fraudulent transfers and transactions, Engle and his Control Group mailed fraudulent reports concerning the Insurance Companies to the Illinois Department of Insurance and to other states in which the Insurance Companies were registered. Also, Shapo claims that various luxury items and their bills were delivered to Engle through the mail and paid for with money from Coronet. According to Shapo, Engle and his Control Group executed many of the transfers of money from Coronet to its Downstream affiliates or Parent Companies through the wires.

The Court is satisfied that Shapo has provided enough specificity about the alleged mail and wire frauds to survive a motion to dismiss. Shapo's third amended complaint illustrates with sufficient specificity the fraudulent misrepresentations allegedly made in annual reports sent through the mails, the luxury items purchased to defraud Coronet, which were delivered through the mails, and the alleged scheme discussed in letters and memos sent through the mails or by fax and in telephone

- 44 -

conversations between Engle and his Control Group and various other people in the Parent Companies and Downstream Affiliates. Thus, Shapo has sufficiently alleged a pattern of racketeering activity, and the Court denies the Group Defendants motion to dismiss on this basis.

### C. RICO Conspiracy

The Group Defendants claim that Shapo has failed to allege a RICO conspiracy under §1962(d) because Shapo has not claimed that each defendant made a "specific agreement ... to participate in the affairs of the enterprise" or "an agreement to the commission of two specific predicate acts."

Section 1962(d) provides, "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." 18 U.S.C. §1962(d). Section 1962(d) is not a substantive RICO offense, but instead §1962(d) merely makes it illegal to conspire to commit a substantive RICO offense. See MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc., 62 F.3d 967, 979 (7th Cir. 1995). To claim a conspiracy to violate §1962(c), Shapo must allege that each defendant agreed to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity and that each agreed that someone would commit at least two predicate acts on behalf of the conspiracy. See id. at 980. The

- 45 -

defendants need not have agreed "to actually commit the predicate acts itself or even to participate in the commission of those acts so long as they agree that the acts would be committed on behalf of the conspiracy." Id.; see also William Electronics Games, Inc. v. Barry, 42 F. Supp.2d 785, 795 (N.D. Ill. 1999). Shapo's third amended complaint clearly sets forth allegations that Engle and his Control Group, which includes Engle, Kennedy, Leonard, Friedman, and the Director Defendants during the times coinciding with their association with the Insurance Companies, acted in agreement in making transfers of cash and assets from Coronet to the Parent Companies and Downstream Affiliates and in covering up their acts by using the mails and wires. These allegations are sufficient to allege a conspiracy involving Engle and his Control Group. See Williams Electronics Games, 42 F. Supp.2d at 795. At this point, these allegations are also sufficient to allege a conspiracy involving the Parent Companies as the Parent Companies are alleged to have had an active role through their agents in participating in an agreement to defraud the Insurance Companies. See supra II.A.1.

## D. Viable RICO Enterprise and McCarran-Ferguson Preemption

The Group Defendants make the same allegations as Engle in his individual motion to dismiss regarding the absence of a viable RICO enterprise and the

- 46 -

McCarran-Ferguson Act's preemption of RICO claims. For the same reasons that the Court denied Engle's motion on these bases, the Court denies the Group Defendants' motion.

### E. Damages

The Group Defendants move to dismiss Shapo's RICO claims, alleging that Shapo has failed to allege any damages to the Insurance Companies.

In order to maintain a RICO claim, a claimant must allege injury to his business or property by reason of a RICO violation. See Esposito v. Soskin, 11 F. Supp.2d 976, 978 (N.D. Ill. 1998). Moreover, the claimant need not allege some additional "racketeering injury" above the injuries resulting from the predicate acts of racketeering themselves. See Haroco, Inc. v. American Nat'l Bank and Trust Co. of Chicago, 747 F.2d 384, 398 (7th Cir. 1984). Shapo has sufficiently alleged damages by stating that the Insurance Companies "were injured in their business and property in an amount in excess of $70 million."

However, the Group Defendants argue that this fails to satisfy the damages requirement because certain provisions of the Illinois Insurance Code under which Shapo is acting limit the amount Shapo can recover on behalf of the Insurance Companies. However, that Shapo may be limited in the amount he can recover

- 47 -

under some state statutes does not demonstrate that he has not asserted that the Insurance Companies were damaged by RICO violations. Further, the Group Defendants fail to demonstrate that Shapo is precluded from pursuing a claim under RICO because of some rule or law limiting Shapo's damages. Section 131.25(a) may limit the amount recoverable for actions thereunder, but sections 193(3) and 205 have no similar limiting cap. The Group Defendants have not shown that some damages limitation of the Illinois Insurance Code precludes a liquidator from seeking RICO awards.

Because Shapo has sufficiently alleged that the Insurance Companies were injured in their business and property because of the alleged RICO violations, the Court denies the Group Defendants' motion to dismiss on this basis.

## F. Pendant State Claims

The Group Defendants move to dismiss Shapo's pendant state claims set out in Counts III, VI, and VIII-XII for failure to state a claim. In evaluating the adequacy of Shapo's pendant state claims, the Court applies the Federal Rules of Civil Procedure, which do not require fact pleading but merely require that a claim provide adequate notice to the defendant of the nature of the claim against it so that

discovery can proceed.  See Kelly v. Stratton, 552 F. Supp. 641, 648-49 (N.D. Ill. 1982).

### 1.  Count III–Breach of Fiduciary Duty and Count VI–Aiding and Abetting a Breach of Fiduciary Duty

Shapo has sufficiently alleged a claim for breach of fiduciary duty and for aiding and abetting a breach of fiduciary duty.  By stating that Engle and the Director Defendants owed a fiduciary duty as directors of the Insurance Companies to the Insurance Companies and that they subsequently breached that duty through their looting of the Insurance Companies, which damaged the Insurance Companies, Shapo has adequately stated a claim for breach of fiduciary duty, which notifies the defendants of the nature of the claim against them.  See Technic Engineering, Ltd. v. Basic Envirotech, Inc., 53 F. Supp. 2d 1007, 1010 (N.D. Ill. 1999) (Illinois has long recognized that corporate officers and directors occupy a fiduciary relationship towards their corporation).

Although it seems that at one point Illinois did not recognize a tort of aiding and abetting a breach of fiduciary duty, it appears that such a claim is now viable. See Reuben H. Donnelley Corp. v. Brauer, 275 Ill. App. 3d 300, 310, 211 Ill. Dec. 779, 787-88, 655 N.E.2d 1162, 1170-71 (Ill. Ct. App. 1995).  Shapo claims that

Kennedy, Leonard, and Director Defendants participated in and facilitated Engle's breach of fiduciary duty by approving, executing, and assisting in the various transactions and transfers of cash and assets out of the Insurance Companies, which resulted in damage to the Insurance Companies. This is sufficient to state a claim for aiding and abetting a breach of fiduciary duty with respect to the Director Defendants, but not with respect to Kennedy and Leonard. See id. In order to state a claim for aiding and abetting a breach of fiduciary duty, the claimant must allege not only that a defendant facilitated an underlying tortious act against a third party by another, but that the defendant's substantial assistance in accomplishing the tortious result itself constitutes a breach of duty to that third person. See id. Shapo has not done this with respect to Kennedy and Leonard, but Shapo has accomplished this with respect to the Director Defendants with his allegations for breach of fiduciary duty in Count III.

## 2. Civil Conspiracy–Count VIII

Shapo alleges that Engle, Kennedy, Leonard, the Downstream Affiliates, and the Director Defendants agreed and combined for the purpose of accomplishing by concerted action violations of the Illinois Insurance Code, including the Illinois Insurance Holding Company Systems Act. With this allegation Shapo has stated a claim for civil conspiracy, which merely requires an allegation of an "agreement or

a combination of two or more people or entities to do an unlawful act or to do a lawful act by unlawful means." Small v. Sussman, 306 Ill. App. 3d 639, 239 Ill. Dec. 366, 713 N.E.2d 1216, 1221 (Ill. Ct. App. 1999).

### 3. Violation of the Corrective Orders and the Holding Company Systems Act—Count IX

The Group Defendants argue that Shapo has failed to state a claim in Count IX because neither a violation of the corrective orders or a violation of the Holding Company Systems Act, 215 ILL. COMP. STAT. ANN. 5/131 et seq., provides Shapo with a private right of action. Shapo contends that even if the two provisions do not explicitly provide him with a private right of action, §§193 and 401 of the Illinois Insurance Code allow Shapo to bring suit in his capacity as liquidator and director of insurance. Further, Shapo argues that even where there is no explicit private cause of action, Illinois courts have "continually demonstrated a willingness to imply a private remedy where there exists a clear need to effectuate the purpose of an act." Venzor v. Gonzalez, 936 F. Supp. 445, 454 (N.D. Ill. 1996).

Shapo has properly alleged violations of the corrective order and the Illinois Holding Company Systems Act. Moreover, it seems that such violations would give

Shapo a right of action. Consequently, at this time, the Court will not dismiss this claim.

### 4. Declaratory Judgment–Count X

The Group Defendants argue that Shapo fails to state a claim for declaratory relief. The Court agrees. Shapo merely asserts the various percentages of certain subsidiaries the Insurance Companies should own, and then states the various percentages of the same subsidiaries Defendants Acton/Sunstates, Sunstate Equities, Sunstates Financial, Sew Simple, Wellco Holdings, RMHC, and Alba Holdings have asserted the Insurance Companies own. Then Shapo requests the Court to declare that the Insurance Companies own the percentages that he asserts. However, this does not state a claim for declaratory judgment. See AG Farms, Inc. v. American Premier Underwriters, Inc., 296 Ill. App. 3d 684, 231 Ill. Dec. 109, 114, 695 N.E.2d 882, 887 (Ill. Ct. App. 1998). Shapo has failed to allege an actual controversy regarding the ownership percentages. In fact, his factual allegations belie the existence of a controversy regarding the ownership percentages. He asserts that the various subsidiaries issued additional common stock and that the Insurance Companies' shares in each were reduced to the amounts alleged by Acton/Sunstates, et al. Shapo alleges no controversy regarding the share

percentages. Rather, Shapo takes issue with the resulting diminution of the Insurance Companies' control in these subsidiaries. This is insufficient to state a claim for declaratory judgment on this issue. See id.

### 5. Accounting–Count XI

Shapo argues that the Insurance Companies are entitled to an accounting from Sunstates Equity, Sunstates Financial, RMHC, Wellco Holdings, and Alba Holdings as a shareholder of each of these companies. However, being a mere shareholder of a company does create an entitlement to an accounting. Shapo must allege an absence of remedy at law and one of the following: (1) a breach of fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; (4) the existence of mutual accounts which are of a complex nature. See Hartigan v. Candy Club, 149 Ill. App. 3d 498, 501, 103 Ill. Dec. 167, 169, 501 N.E.2d 188, 190 (Ill. Ct. App. 1986). An exception exists if the claimant alleges a breach of fiduciary duty such that an accounting may be ordered without alleging an absence of an adequate remedy at law. Nevertheless, Shapo fails to allege any breach of fiduciary duty by any of the subsidiaries in his third amended complaint, and fails to alternatively allege an inadequate remedy at law in conjunction with a need for discovery. See id. Thus, Shapo has failed to state a claim for accounting.

- 53 -

### 6. Violation § 5(a)(1) of the Uniform Fraudulent Transfer Act–Count XII

The Group Defendants claim that 1996 Transactions do not come under the Uniform Fraudulent Transfer Act, 740 ILL. COMP. STAT. ANN. 160/1 et seq., and that Shapo has not met the 9(b) pleading requirements for this claim.

Under Uniform Fraudulent Transfer Act, a transfer is fraudulent as to a creditor if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor. See 740 ILL. COMP. STAT. ANN. 160/5(a); Kennedy v. Four Boys Labor Service, Inc., 279 Ill. App. 3d 361, 369, 216 ill. Dec. 160, 165, 664 N.E.2d 1088, 1093 (Ill. Ct. App. 1996). A "transfer" includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." 740 ILL. COMP. STAT. ANN. 160/2(l). Under such a definition Coronet's surrender of $6.4 million in bonds and preferred stock of certain subsidiaries would qualify as a transfer. However, the issuance of additional common stock by these subsidiaries cannot be viewed as a transfer. Although the issuance of additional stock reduced the Insurance Companies' overall interest in these subsidiaries, it cannot be said that the Insurance Companies disposed of or parted with shares they held or with an interest in shares they held.

- 54 -

With respect to the 5.4 million surrender in bonds and preferred stock, Shapo has state his claim with sufficient particularity. Shapo alleges that in November 1996, Engle and the then-serving Director Defendants caused Coronet to surrender $6,427,296.25 in bonds and preferred stock of Sunstates Equities, Sunstates Financial, Alba Holdings and RMHC. Shapo further claims that Coronet received nothing in return, did not report the transaction to insurance regulators, and instead treated the transaction as capital contributions. This is sufficient to meet the requirements of Rule 9(b).

### G. Personal Jurisdiction

Finally, the Group Defendants argue that the Court lacks personal jurisdiction over Albritton, Kennedy, and Leonard because as non-residents of Illinois they are protected by the fiduciary shield doctrine. This argument is without merit.

The fiduciary shield doctrine is a limitation on the reach of Illinois' long-arm statute. See Ace Novelty Co., Inc. v. Vijuk Equipment, Inc., No. 90 C 3116, 1991 WL 150191, at *5 (N.D. Ill. July 31, 1991). It protects a non-resident from being haled into court in Illinois when that person's only contact with Illinois occurred in the course of working on behalf of that person's corporation. Id. However, this defense to personal jurisdiction is unavailable to high-ranking corporate officers because individuals in these positions have a "direct financial stake in the company's

- 55 -

health and therefore can be subjected to personal jurisdiction for actions that result in both personal and corporate benefit." Margulis v. Medical Parts Int'l, Inc., No. 98 C 0714, 1999 WL 183648, at *5 (N.D. Ill. Mar. 25, 1999). Further, to avoid application of the doctrine all complainant needs to do is allege in good faith that the performed acts advanced personal interests rather than the corporation's interests. See Torco Oil Co. v. Innovative Thermal Corp., 730 F. Supp. 126, 135 (N.D. Ill. 1989).

Because Albritton, Kennedy, and Leonard are all high-ranking officers, they cannot avail themselves of the doctrine. Moreover, Shapo maintains in his third amended complaint that these three defendants acted for their own benefit. Consequently, the Court will not apply the fiduciary shield doctrine.

## CONCLUSION

For the reasons set forth above, the Court: (1) denies that part of Engle's motion to dismiss Counts I and II, which argued that Coronet is not a proper enterprise, but grants that part of Engle's motion, which argued that Acton/Sunstates and the Association-In-Fact were not proper enterprises; (2) denies Engle's motion to dismiss, which argued that the McCarran-Ferguson Act precluded the application

of RICO to this action; (3) denies the Group Defendants' motion to dismiss the underlying fraud claims of the RICO counts, except that the Court grants the Group Defendants' motion to dismiss as it relates to the LaSalle Bank Loan and the Spring Lots transaction; (4) denies the Group Defendants' motion to dismiss, which claimed that Shapo failed to allege predicate acts, a conspiracy, a proper enterprise, or damages, and that the McCarran-Ferguson Act preempted Shapo's RICO claims; (5) denies the Group Defendants' motion to dismiss Counts III, VI, VIII, and IX, except the Court grants the Group Defendants' motion to dismiss Count VI as it relates to Kennedy and Leonard; (6) grants the Group Defendants' motion to dismiss Counts X and XI; (7) denies that part of the Group Defendants' motion to dismiss Count XII as it relates to the $6.4 million Coronet bond and stock transfer, but grants the motion as it relates to the subsidiaries' issuance of additional common stock; and (8) denies the Group Defendants' motion to dismiss with respect to Albritton, Kennedy, and Leonard for lack of personal jurisdiction.

Charles P. Kocoras
United States District Judge

Dated: _____ November 10, 1999 _____

- 57 -